THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
RONALD DALE DURHAM, Defendant-Appellant.

Fourth District   No. 4—85—0070

Opinion filed April 3, 1986.

Daniel D. Yuhas and John J. Hanlon, both of State Appellate Defender's Office, of Springfield, for appellant.

J. William Roberts, State's Attorney, of Springfield (Kenneth R. Boyle, Robert J. Biderman, and Michael Blazicek, all of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE GREEN delivered the opinion of the court:

On May 21, 1984, defendant, Ronald Dale Durham, was charged by information in the circuit court of Sangamon County with the May 8, 1984, murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(1)(2)) of his wife, Janet. After a jury trial defendant was found guilty and convicted on December 17, 1984. On January 25, 1985, the court sentenced him to 30 years' imprisonment. He appeals, contending the trial court erred (1) in refusing to suppress and admitting into evidence over defense objection admissions obtained from defendant in violation of his *Miranda* rights; (2) in refusing to suppress other statements of defendant taken in violation of his *Miranda* rights even though no objection to the admission of the evidence was ever made; (3) in refusing to ask prospective jurors certain *voir dire* questions submitted by defendant; (4) in admitting in evidence at trial a statement made by defendant to a physician who was then examining him in regard to his fitness to stand trial; and (5) in imposing an excessive sentence. We affirm.

Although defendant does not contest the sufficiency of the evidence to support the verdict, some recitation of the evidence is necessary to an understanding of the defendant's claims of error. The evidence was undisputed on some significant points. Both defendant and the victim, Janet Durham, had previously been married, and their present marriage had not run smoothly. They had been separated for five or six weeks prior to the victim's death, and some 10 days before her death, they had a dispute in which defendant was alleged to have drawn a handgun. Evidence also indicated that the victim had a problem with over-consumption of alcoholic beverages.

On the night of May 7, 1984, she had gone to Spencer's tavern in Springfield. Sometime after midnight, she left the tavern and went to her parked car where she talked for awhile with Rex Griffin, who had been in the tavern. Defendant drove up at that time and upon his request, Griffin left. At about 2 a.m. on May 8, 1984, a police officer called to the scene found the body of Janet Durham in the front seat of the vehicle.

Dr. Grant Johnson, a pathologist who performed an autopsy on Janet's body, testified to finding bullet entry wounds (1) at the back of the head, (2) at the upper right chest, (3) below the right breast, and (4) in the back region. He stated an opinion that the upper right chest wound had been the first one and that bullet had gone to the heart and caused death within a few seconds. He was of the opinion that all wounds resulted from shots fired from a gun in "tight contact" with Janet's body. Johnson also testified to finding a

pattern of soot deposits on Janet's hands which would indicate that her hands were in close proximity to the junction between the barrel and the cylinder of the revolver when it was fired. According to the doctor, the pattern on Janet's left hand could have occurred if she had fired the gun herself if the right hand had been used to pull the trigger, but he had never seen such a pattern in a suicide case.

Defendant testified to the following version of events on the evening of Janet's death: (1) He was suspicious of her relationship with other men; (2) he drove past Spencer's tavern and saw Janet's car in the parking lot; (3) he then parked nearby and watched for awhile and then went to Riverton to buy some beer; (4) he then returned to park outside Spencer's and watch; (5) at about 10 p.m. a police officer came by, asked what he was doing, and at defendant's invitation, searched defendant's vehicle and found no gun in it; (6) after driving around further, defendant returned and saw his wife talking to three men; (7) he went home but decided to go back and talk to his wife about their proposed divorce; (8) upon returning, defendant found Janet in her car talking to a man who was sitting in the car with her; (9) at defendant's request, the man left and defendant got into the car with Janet and told her he no longer wanted anything to do with her; (10) he saw no gun in the car at that time; and (11) defendant shortly got out of the car and walked off.

According to defendant, after he walked a short distance, he heard a "loud noise" and returned to the vehicle where he saw his wife leaning to one side with a gun in her right hand. Defendant stated that he shook her body, recognized that she was dead, took the gun, and fired shots into her side or stomach, her back and her head. Defendant described his mental state then as jumbled and angry but that he did not want her to suffer. Defendant testified that he remembered the events but did not think that, at the time of the shooting, he was conscious of what he was doing. According to defendant's version of the events, he then drove from the scene, stopping on the way to vomit and throw the gun into a sewer.

Dr. Leslie Fyans, a certified clinical psychologist who had examined defendant, testified that in his opinion defendant had a personality disorder that constituted a mental disease or defect which caused defendant to lack the ability to conform his behavior to the requirements of the law at the time Janet Durham was killed. In rebuttal, Dr. Fenton Drake, a psychiatrist, who had also examined defendant, testified that, in his opinion, defendant's personality disorder was not a mental illness and was not such a condition as

would deprive defendant of the power to conform his conduct to the requirements of law.

A substantial portion of the proof of defendant's guilt arose from statements he was alleged to have made to police officers upon his first contact with them after his wife's death and subsequently while he was being held. His motion to suppress the statement he was alleged to have made upon first contact with the officers was denied and the evidence was admitted over his objection. The other statements were also covered by defendant's motion to suppress which was denied, but were admitted without objection. Defendant contends that the admission of this evidence was plain error and the failure of his counsel to object constituted incompetency.

Defendant testified at trial that after throwing the gun in the sewer, he drove to the residence of Mary Jo Leeds and went to her door. According to defendant, he said "Mary Jo, call the police. I think Jan has been killed." Ms. Leeds testified at trial and at defendant's earlier motion to suppress that she was sure defendant said, "You better call the police. I think I just killed Jan." Ms. Leeds further testified that defendant also asked her to call a list of people, saying he thought he would be in jail by morning. In any event, the police were called and Officers Hubbs and Charles came to the Leeds' home.

Hubbs testified at the suppression hearing and at trial that upon his arrival at the Leeds' home Mary Jo Leeds met him at the door and told him that defendant was in the kitchen and had told her that he believed he had killed his wife. According to Hubbs, upon his entry into the kitchen he saw defendant there and asked defendant what his name was and then asked what was the matter and defendant responded, "I think I have just killed my wife." According to Hubbs, he then read defendant his *Miranda* rights. According to Charles, defendant merely stated that he thought his wife was dead and she had been shot. Charles thought the *Miranda* warnings were not given until 15 to 20 minutes later. Both at the hearing and at trial defendant testified that his statement to Hubbs was as Charles testified.

■ Under the ruling in *Miranda v. Arizona* (1966), 384 U.S. 436, 16. L. Ed. 2d. 694, 86 S. Ct. 1602, any statement made by a defendant to a law enforcement officer during custodial interrogation prior to being given the required warnings is involuntary and subject to suppression. Defendant argues strenuously that the statement Hubbs claims he made arose from custodial interrogation by a police officer prior to *Miranda* warnings and should have been sup-

pressed. Clearly, Hubbs was a police officer and no *Miranda* warnings had been given at that time. The evidence indicated that Hubbs expected to receive an answer from defendant that was likely to be incriminating. Accordingly, the questions asked by Hubbs constituted interrogation. (See *Rhode Island v. Innis* (1980), 446 U.S. 291, 64 L. Ed. 2d 297, 100 S. Ct. 1682; 1W. LaFave & J. Israel, Criminal Procedure sec. 6.7(b) (1984).) However, the trial court, in denying suppression, found that defendant was not in custody at the time. We must determine whether that finding was, as claimed by defendant, contrary to the manifest weight of the evidence and contrary to law.

■ In *People v. Berry* (1984), 123 Ill. App. 3d 1042, 463 N.E. 2d 1044, this court discussed four factors which are relevant in determining whether custody exists. These factors are: (1) the place of interrogation; (2) statements or nonverbal conduct indicating an accused is not free to leave; (3) the extent of the knowledge of the police officers and the focus of their investigation; and (4) the intention of the police officers. This court also stated that the question of whether interrogation is custodial should be decided upon the totality of the circumstances and the question of "what a reasonable man innocent of any crime would perceive" to be the situation. (123 Ill. App. 3d 1042, 1046, 463 N.E.2d 1044, 1048.) The *Berry* court cited *People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870, and indicated the court was following the holding in that case. *Wipfler* is the most recent Illinois Supreme Court decision on the question of the elements of custody.

In *Wipfler*, police officers had learned that (1) defendant had been seen riding a motorcycle in the vicinity of where a house was burglarized, and (2) motorcycle tracks were present around the house where the burglary took place. Police officers then phoned the defendant's mother requesting she have defendant meet them at the local police station that evening. The defendant arrived at the police station and submitted to questioning about the burglary. The defendant first contended that he knew nothing about it, then admitted he had some knowledge but did not state how much. Finally he told the officers that he would tell the truth.

The *Wipfler* court held that the defendant had not been arrested at the time he told the officers he would tell the truth and proceeded to make an incriminating statement. The court noted that it appeared that the officers considered the defendant to be under arrest, but concluded it did not have to reach that question. According to the court, because it had determined that an "innocent man would not have understood himself to be under arrest," no further

determination was necessary. *People v. Wipfler* (1977), 68 Ill. 2d 158, 167, 368 N.E.2d 870, 873.

The strongest evidence in support of defendant's contention that he was in custody when Hubbs asked him about his problem was the testimony of Hubbs at the hearing on the motion to suppress. Hubbs testified that at that time he (1) considered defendant a suspect, (2) would not have let defendant leave, and (3) considered him to be in custody. However, under *Berry* and *Wipfler* we must look at the totality of the circumstances. Under *Wipfler*, a trier of fact need not look to the subjective belief of the alleged custodian before determining that a subject is not in custody if other evidence strongly so indicates.

Here, the *Berry* factors, other than those concerning the mental state of the police officers, strongly negate the existence of custody. The place of interrogation was the house of a friend of defendant selected by him as one where he wished to talk to police. The place would seem to be less custodial than would the death scene. The officers came at defendant's request and not in search of him. The only questions they had asked were as to defendant's name and why he wished to talk to them. The officers did search defendant but that occurred after the two questions had been asked and answered. Nothing would indicate that defendant was not free to leave except that the interrogators were officers and his wife had been killed. Defendant testified he did not feel free to leave but the court did not have to believe that testimony.

Both *Berry* and *Wipfler* emphasize the significance of how a reasonable innocent person would interpret the situation at the time of interrogation. At the hearing on the motion to suppress, substantial testimony indicated that defendant told Leeds and Hubbs that *he* had killed his wife. However, defendant testified that he merely stated that she had been killed. The trial court could have properly believed defendant. In any event, under the *Wipfler* and *Berry* standard for determining custody the situation is viewed from the perspective of an innocent person who is being questioned. Where an innocent person has gone to the house of a friend and asked that the police be called so that he can inform them that his wife has been killed, such a person would not reasonably assume that he was in custody upon the arrival of the police.

The State suggests that the interrogation which resulted in defendant's making an initial statement to Hubbs should be deemed not subject to *Miranda* requirements on the basis of the on-the-scene exception to the *Miranda* rule. (*People v. Clark* (1980), 84 Ill.

App. 3d 637, 405 N.E.2d 1192.) We must reject application of the exception because the Leeds' home was not the scene of the alleged offense. However, we deem the circumstances here to be such that the trial court could have properly found the situation here to be even less custodial than on-the-scene questioning would have been.

■■ The trial court's finding that defendant was not in custody at the time of the initial interrogation was neither contrary to the manifest weight of the evidence nor contrary to the law. No error resulted from refusing to suppress and admitting this evidence.

The evidence at the motion to suppress hearing and at trial indicated that at various times throughout May 8, 1984, various law enforcement officers interrogated defendant. All of this was after defendant had been given *Miranda* warnings at the Leeds' residence. Usually, he stuck with his story that he did not kill his wife. Statements incriminating defendant were allegedly taken at an interview beginning at 3 p.m. and one later beginning at about 8:45 p.m. New *Miranda* warnings were given before the 8:45 interrogation. Both interrogations were conducted by Detectives Womack and Castleman.

According to Castleman, at the afternoon interrogation, defendant first told him that he did not tell Leeds that he had killed his wife but later said that if Leeds "said [he] said those things, then [he] did." Castleman also testified that at that interrogation he had asked defendant several times if he had killed his wife and that defendant responded first that he "believed [he] could have done it," then responded that he "probably did do it." Womack testified that he was present during all of the questioning at the 3 o'clock interrogation but did not testify to defendant making the admissions stated by Castleman. Both Womack and Castleman testified that at the 9:40 interrogation defendant stated at various times (1) he "accepted" that he had shot his wife but "could not remember"; (2) "in the back of his mind he felt he had done it" and realized that, when he went to the Leeds' house; and (3) he could not believe he "had done it" but must have.

At about 4:14 a.m. an interrogation began in which defendant was asked to submit to a neutron activation analysis test which was designed to detect barium powder residue on his skin. Defendant refused to take the test without first talking to a lawyer. According to Castleman, who was conducting the interrogation, defendant made clear that he would continue to talk but only wanted the attorney in regard to the testing. Defendant maintained that his early request for a lawyer was because of the test but that he eventually

requested counsel as a condition of further questioning. Defendant contends that his request for counsel at this time and the fact that he had not received *Miranda* warnings since the early morning hours vitiated the evidence of admission he had allegedly made at the interrogation beginning at 3 p.m.

■ When a defendant has been given *Miranda* warnings, waives those rights, submits to interrogation, and then requests an attorney before again answering questions, law enforcement officers must cease interrogation for a significant time and can only begin interrogation again after further *Miranda* warnings are given and a new waiver has been obtained. (*People v. Faison* (1979), 78 Ill. App. 3d 911, 397 N.E.2d 1233.) However, here the trial court could properly have believed the evidence of the State that defendant made clear that his request for a lawyer had nothing to do with the interrogation and that he was willing to continue with that. Moreover, the evidence as presented by the State clearly indicated that defendant understood his right to counsel and was willing to waive it for the purpose of further interrogation. We need not study the questions of whether there was plain error or incompetence of counsel for not preserving the error. No error occurred.

Neither the length of time between the earlier *Miranda* warnings nor the earlier request of counsel vitiated the evidence of statements made by defendant at the 8:40 p.m. interrogation. New warnings had been given and a waiver made and a reasonable time had elapsed since the defendant had requested counsel. The main concern with this interrogation was that it came at an evening hour when defendant apparently had been without sleep since the morning of the day before. However, the record did not show that he objected to continuing the interrogation and as we have stated, the record also indicates that he was aware of his rights. We also find no error to have occurred in the admission of this evidence.

■ Significantly, even if the evidence of the original statement which Hubbs testified that defendant made concerning killing his wife should have been suppressed because of lack of *Miranda* warnings, that would not render subsequent statements taken from defendant after such warnings were given involuntary. In the recent case of *Oregon v. Elstad* (1985), 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285, the court held that the fact that a statement has previously been taken from an unwarned suspect in a manner that does not involve actual coercion does not prevent the subsequent proper taking of statements after *Miranda* warnings. Clearly, defendant was not under actual coercion when answering Hubbs' ini-

tial questions.

We consider next defendant's assertion that the trial court improperly refused to ask the jurors during *voir dire* two of three questions he had submitted. The two questions refused were:

"1. Do you have any feeling or viewpoint concerning the defense of insanity? If so, what is it?

2. Do you agree that a person should not be held responsible for his acts if he is not capable to conform his conduct to the requirements of the law?"

However, the following submitted question was asked of each prospective juror:

"If the evidence should show that the defendant was insane at the time of the occurrence, would you be willing to return a verdict of not guilty by reason of insanity?"

Relying on the decisions in *People v. Stack* (1984), 128 Ill. App. 3d 611, 470 N.E.2d 1252, and *People v. Moore* (1972), 6 Ill. App. 3d 568, 286 N.E.2d 6, defendant maintains that the court committed reversible error in refusing to ask all of the questions requested by him. In *Stack*, the defense requested the court to interrogate the jury on *voir dire* with questions, three of which were similar to those requested here. The fourth question inquired whether the prospective juror had any experience with a psychiatrist or a psychologist. The court asked only the last question. On appeal, the court held that refusal to ask any question in regard to bias against the insanity defense was reversible error which was not cured by asking general questions as to whether the prospective juror would follow the law. Similarly, in *Moore*, an appeal from the denial of a post-conviction petition, the court held that the trial court's refusal to allow questioning of all but a few jurors in regard to their "attitude on the defense of insanity," together with other errors, required a new trial. (*People v. Moore* (1972), 6 Ill. App. 3d 568, 571, 286 N.E.2d 6, 8.) The *Stack* court used similar language. *People v. Stack* (1984), 128 Ill. App. 3d 611, 616, 470 N.E.2d 1252, 1256.

Here, after the jurors had been told the elements of the insanity defense, each juror selected indicated that he or she would be able to return a verdict of not guilty by reason of insanity if the evidence so indicated. However, defendant contends that further questioning of several prospective jurors was required because their answers were equivocal. One juror, before responding that he would be able to do so, had stated that his ability was "questionable" but had not been permitted to elaborate on why that was so. Another had first answered that she would "try." Another who actually served

first stated, "I don't really know." Another had also said he would try but had previously had some experience with psychiatry. In addition, two other jurors who actually served had responded that they "believed" they could return a verdict of not guilty by reason of insanity if required by the evidence.

The defense interprets the requirement of *Moore* and *Stack* in regard to examining prospective jurors concerning their "attitude on the insanity defense" as requiring detailed questions in regard to their thoughts on the subject. We do not agree. Asking a prospective juror whether he or she can return a verdict on the issue shows the juror's "attitude." The State did not seek to rely on general questions as to whether the prospective jurors could follow the instructions and be fair and impartial as was the case in *Stack*. In *People v. Teague* (1982), 108 Ill. App. 3d 891, 439 N.E.2d 1066, where the insanity defense was also interposed, the court permitted only (1) a question as to whether there was anything about the insanity defense which would prevent them from being fair and impartial, and (2) further questions as to those who indicated they had prior dealings with psychiatrists. The appellate court held that the trial court did not abuse its discretion in so limiting the *voir dire*.

While permitting further questioning here might have been desirable, we find no abuse of discretion in the limitations imposed by the court. The question asking for the prospective juror's "viewpoint" on the insanity defense was extremely broad and would likely elicit an argumentative prejudicial response. If permitting that type of question is what the *Moore* and *Stack* courts intended in questioning as to the "attitude in regard" to the defense, we are not in agreement with those courts. To avoid prejudice to other prospective jurors in regard to such questioning, the court would have to examine the prospective jurors individually in the absence of any selected or prospective jurors. No error resulted from the procedure used by the trial court here.

In his testimony in rebuttal to the insanity testimony put on by defendant, Dr. Drake testified that when he was examining defendant on the question of his fitness to stand trial, defendant told him he had a gun with him when he drove back from Riverton to the tavern on the night defendant's wife was killed. This impeached and contradicted the testimony of defendant at trial that he had no gun with him at the time. Raising the question for the first time on appeal, defendant contends that the admission of this testimony constitutes plain error because it violated statutory restrictions on the use of such testimony. Sections 104—14(a) and (c) of the Code of Crimi-

nal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, pars. 104—14(a),(c)), respectively prohibit the introduction of admissions made by a defendant during a fitness examination unless the evidence is introduced on the issue of insanity or intoxication and unless certain warnings not stated here were given to the defendant by the court.

■ We need not consider whether this testimony did bear upon the issue of defendant's insanity as contended by the State. We also need not consider the State's assertion that the situation here is analogous to that in *Estelle v. Smith* (1981), 451 U.S. 454, 68 L. Ed. 2d. 359, 101 S. Ct. 1866, and *People v. Silagy* (1984), 101 Ill. 2d 147, 461 N.E.2d 415, where admission by the defendant during fitness examinations were held generally admissible in death sentence hearings as long as the defendant, as here, had requested the fitness hearing and examination. In any event, any impropriety in the admission of the evidence fell far short of plain error. Other evidence also implied that defendant had possession of the weapon used to kill his wife.

■ Defendant next contends that he should have been discharged before trial because he was not given a fitness hearing within the time period provided by statute. Section 104—16(a) of the Code of Criminal Procedure of 1963 states:

"Sec. 104—16. Fitness hearing. (a) The court shall conduct a hearing to determine the issue of the defendant's fitness within 45 days of receipt of the final written report of the person or persons conducting the examination or upon conclusion of the matter then pending before it, subject to continuances allowed pursuant to Section 114—4 of this Act." (Ill. Rev. Stat. 1983, ch. 38, par. 104—16(a).)

Defendant is correct in his contention that he had no fitness hearing within the time frame set therein. However, section 104—16 provides no sanction for such a violation. Section 103—5(d) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 103—5(d)) requires a discharge if speedy trial provisions are not met, but when other statutory or constitutional requirements for a prompt hearing are not accompanied by provisions for sanctions, no dismissal or imposition of other sanction has been required. (*People v. Howell* (1975), 60 Ill. 2d 117, 324 N.E.2d 403; *People v. Hendrix* (1973), 54 Ill. 2d 165, 295 N.E.2d 724.) Ordering a discharge here for tardiness in holding the fitness hearing is neither appropriate nor required.

■ Plain error is also claimed by the defendant here because the trial court did not *sua sponte* instruct the jury that the State

bore the burden of disproving the existence of a mitigating factor of intense passion which would have reduced the severity of the offense involved from murder to voluntary manslaughter. Defendant relies on the decision in *People v. Bolden* (1985), 132 Ill. App. 3d 1047, 477 N.E.2d 1380, where this court held that once evidence of the mitigating elements which would reduce a homicide to manslaughter is introduced, the State has the burden of negating the elements in order to obtain a murder conviction. This case was tried before *Bolden*, and, at the defendant's request, the traditional instructions on voluntary manslaughter were given. The evidence of the mitigating factor of intense passion consisted of slight inference and would have been contrary to defendant's testimony. Under all the circumstances, we are fully persuaded that no plain error resulted.

■ Finally, defendant argues that his sentence of 30 years' imprisonment was excessive. It is not disputed that the trial court considered all the matters in aggravation and mitigation. However, the court did consider the defendant's education and business sophistication and indicated that a person so situated was more reprehensible in committing a murder than would be a person without those advantages. Defendant contends that in doing so, the court failed to consider defendant's rehabilitative potential. (*People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677.) While those characteristics are helpful to rehabilitation, we find no error in the trial court's indicating that a person with those advantages had little excuse for committing a murder. Moreover, the statement of the trial court that defendant had these qualities was also part of the court's explanation of why he believed defendant's conduct was premeditated. The evidence indicated that defendant brutally fired several shots into his wife's body. The sentence imposed was not a breach of discretion. *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.

As previously indicated, we affirm the conviction and sentence.

Affirmed.

McCULLOUGH, P.J., and SPITZ, J., concur.