THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JOHN JURCZAK, Defendant-Appellant.

Second District   No. 84—0924

Opinion filed September 18, 1986.

G. Joseph Weller and Kathleen J. Hamill, both of State Appellate Defender's Office, of Elgin, for appellant.

Robert J. Morrow, State's Attorney, of Geneva (Kenneth R. Boyle, of State's Attorneys Appellate Prosecutor, of Springfield, and William L. Browers and Peter M. Tumminaro, both of State's Attorneys Appellate Prosecutor, of Elgin, of counsel), for the People.

JUSTICE REINHARD delivered the opinion of the court:

Following a jury trial, defendant, John Jurczak, was found guilty of murder but mentally ill (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a), 6—2(c)) and was sentenced to a 20-year term of imprisonment. Defendant raises three issues on appeal: (1) whether the trial court erred in allowing the prosecution to present as evidence a tape recording of the victim's telephone call to the 911 emergency number and the victim's bloody clothing; (2) whether the trial court's refusal to allow defense counsel to ask certain questions regarding the insanity defense and personal physical disability of the jurors or their families on *voir dire* was error; and (3) whether alleged improprieties in the prosecutor's cross-examination of a defense witness and the defendant deprived defendant of a fair trial.

Although defendant does not contest the sufficiency of the evidence to support the verdict, some recitation of the evidence is necessary for an understanding of the defendant's claims of error. The victim, Catherine Jurczak, was stabbed to death on May 4, 1983, shortly after calling the 911 operator for help and while the telephone line was still connected. Police officers arrived on the scene minutes later and, after finding defendant at the scene, took defendant to the police station. After signing a waiver of his *Miranda* rights, defendant answered questions and signed a statement which admitted that he had stabbed his wife.

Several months prior to trial, defendant filed a motion *in limine* requesting that the prosecution be precluded from introducing the tape recording of the victim's telephone call to the 911 Quad-Com Emergency Communication Center during their case in chief, arguing that any probative value of the tape recording would be outweighed by its prejudicial emotional impact on the jury. Following a hearing, the court denied the motion finding that the State had the right to use the tape recording in order to prove its case.

During a lengthy *voir dire*, defense counsel questioned prospective jurors concerning their attitudes toward the insanity defense, asking questions such as whether they felt any qualms or personal feelings about the issue of insanity in criminal proceedings and if there was anything about returning a verdict of not guilty by reason of insanity that caused them any concern. The prosecution objected to defense counsel's further questioning the first panel of jurors as to whether they were concerned about the consequences of a finding of not guilty by reason of insanity. The prosecution also objected to the following question asked by defense counsel:

"Have *** you had, in your personal lives or in your [*sic*] lives

of your families or close friends, any situation where someone has been disabled because of an injury for any extended period of time, and I mean let's say more than two weeks?"

Both objections were sustained.

The State was allowed to question prospective jurors as to whether they agreed that just because a person kills another person, outside of war, that doesn't necessarily mean that person is insane. Both defense counsel and the prosecution were allowed to question prospective jurors extensively regarding their feelings toward, and past experiences with, alcoholism.

Immediately prior to the presentation of the prosecution's case in chief, defendant objected to the introduction of the victim's bloody clothing into evidence, arguing that the clothing had no probative value and would be unavoidably prejudicial. The objection was denied, but the clothing was not allowed to go to the jury room.

At trial, the State presented the testimony of six Carpentersville police officers. Kenneth Zons and Marcia Davis testified that they were the first to arrive at defendant's home on May 4, 1983. Officer Zons knocked at the back door, and, after a short period of time, defendant answered and said that "it is too late, she is already dead." Zons then took defendant to a chair. Davis found the victim lying on the kitchen floor in a pool of blood with three visible chest wounds and cuts on her hands and fingers. Davis also saw a knife laying on top of the sink. Zons advised defendant of his *Miranda* rights and asked if he understood, and defendant answered "no."

Defendant was later taken to the police station where he was again advised of his rights, stated he understood his rights, signed a waiver-of-rights form, and, when asked why he stabbed his wife, stated that he wanted her to leave the problems of the world. He then answered questions in the presence of Officers Jerry Ford and Robert Wiggins. The questions and his answers were typed and signed by defendant. The statement was read to the jury. Briefly summarized, defendant stated that he had been drinking for a long time, that he had been worrying, that he had been arguing with his wife, that "something just snapped up here (pointed to his head)," and that he stabbed her in the kitchen with a butcher knife so she wouldn't suffer from old age. He also stated that she had just called the police, but he didn't remember if she was on the telephone when he stabbed her.

Earl Stiegemeyer of the police department identified the butcher knife found in the kitchen of defendant's home and identified the victim's bloodstained clothes which were removed from her body prior to an autopsy. He and Officer Davis identified photographs taken of the

victim and of the home. The knife and some of the photographs were allowed to go the jury room during deliberations. Dr. Patrick Garry, who performed the autopsy, testified that there were five stab wounds in the victim's chest area, one in the crook of her left elbow, and multiple wounds involving the fingers of both hands, which he stated were typical of defensive wounds. The fatal stab wound penetrated the heart and a portion of the left lung causing a massive loss of blood.

Charles Johnson, the director of Quad-Com, which answers emergency calls and dispatches the police and fire departments, testified that all telephone calls into the center are recorded on tape. A police-dispatch card was introduced which showed that the first dispatch to defendant's address went out at 1:31 a.m. and the first officer arrived on the scene at 1:33 a.m. The tape of the victim's telephone call to Quad-Com was then played for the jury. Immediately following this the prosecutor stated, "[a]ny members of the jury wish to hear that again? We can play it again." Defense counsel objected, and the trial judge stated that once was sufficient. Defense counsel then made a motion for a mistrial, renewing defendant's previous objections to the playing of the tape, as well as objecting to the prosecutor's remark following the playing of the tape and the fact that the tape was played beyond a previously agreed to cutoff point. The motion was denied. The tape was not played again and did not go to the jury room.

The State also presented the testimony of defendant's daughter and son-in-law, Deborah and Terry Carroll, and his daughter's former fiance, Edward LaMange, who all stated that defendant had been drinking heavily since he injured his leg in November of 1982. They also testified that he was increasingly depressed about not being able to return to work, was worried about money, and was not eating. Terry stated that defendant was depressed about the loss of workers' compensation benefits and was worried about the possibility of his wife losing her job. Deborah and Terry testified that he was worried about his wife's health. Terry and LaMange stated that defendant had discussed suicide, and Deborah and LaMange stated that defendant complained of pain in his leg. Deborah testified regarding an incident she observed a few months prior to the victim's death where, during an argument, the victim hit defendant on the back and defendant then grabbed her by the throat. LaMange stated that he had heard defendant say about five times that he would be happy when his wife was gone or that he wished she were dead.

The defense presented the testimony of Paulette Botteron, defendant's daughter, who stated that her father was drinking more

after he injured his leg. On cross-examination, she stated that arguments between her father and mother were more frequent following his leg injury and that she had advised her mother to get a divorce.

Defendant testified on his own behalf. He stated that he stopped drinking in 1971 following a hospitalization for alcohol-related health problems, but resumed in 1980. He injured his leg at work in November 1982, and was told by his doctor in mid-April 1983 that he could go back to work if he could sit down. His boss told him that there was no desk job available and that his workers' compensation benefits were being cut off as of May 6, 1983. He testified that he was also worried about his wife as she told him she was very sick, she was getting thin, and she had problems at work and thought she might lose her job. He was drinking more and more, approximately two bottles of blackberry brandy and a dozen and a half cans of beer a day. He stated that for the last three weeks before his wife's death he didn't eat anything at all. He testified that he started seeing things several days before the incident and decided to commit suicide. He stated that the night of the incident he had a vision that his wife was all dried up in bed and was crying for help. He also felt he had two heads; the one on his shoulder was telling him there was no way out and that he should commit suicide and take her with him. He got the butcher knife which he kept in the kitchen, told her he was going to kill her with it, and stabbed her after he heard her call the police.

Defendant also testified that his wife told him at one time that their daughter Paulette had suggested to her that she get a divorce. On cross-examination he was asked if he had ever physically abused his wife, and he admitted that he hit her once. He was asked if he ever hit her with a crutch and answered that he didn't remember. There was no objection to the question.

Defendant then presented the testimony of Dr. Eric Ostrov, a psychologist and attorney who administered a number of psychological tests on defendant. He concluded from the tests, two interviews with defendant, a review of police records and after listening to the 911 tape recording, that defendant had alcohol dependence, probably had organic brain damage associated with alcoholism and also was suffering from major depression and a personality disorder. He stated that there was some evidence of physical abuse by defendant toward his wife. He testified that defendant's ability to control himself at the time of his wife's death was substantially impaired.

Dr. Lyle Rossiter, a psychiatrist, testified that he interviewed defendant and reviewed police reports, defendant's medical history, and reports of interviews with family members and acquaintances. In

his opinion, defendant was suffering from chronic alcoholism and very severe depression. He stated that because of the psychotic depression, defendant lacked substantial capacity to conform his conduct to the requirements of the law. He also stated that defendant was no longer suffering from a mental disease when he saw him in October of 1983.

Dr. Edward Senay, a professor of psychiatry at the University of Chicago, testified that he reviewed reports, but did not examine defendant. He concluded that defendant had a mixed organic mental disorder caused by his alcohol intake and, at the time of the incident, he had some appreciation of what he was doing, but couldn't really conform his behavior to the requirements of the law.

On rebuttal, the State presented the testimony of Dr. Frank Johnson, a psychiatrist, who testified that he diagnosed defendant as suffering from chronic alcoholic dependence and abuse. He stated that, in his opinion, it is almost impossible to make a diagnosis of a major mental illness considering the heavy drinking defendant was engaging in. He further testified that defendant was able to appreciate the criminality of his actions and control his actions at the time of the killing. Dr. Werner Tuteur also testified that, based on two interviews with defendant, he found no evidence of a mental disease and that defendant could appreciate the criminality of his actions.

Based on this evidence, the jury found defendant guilty of murder but mentally ill. He was sentenced to a 20-year term of imprisonment.

Defendant first contends that it was error for the trial court to allow the State to play the 911 tape recording for the jury and to display the victim's bloody clothing. He argues that neither exhibit had probative value as a rebuttal of defendant's insanity defense and both were gruesome and highly prejudicial.

The less than two-minute tape recording contains the victim's relatively calm voice requesting help and giving her address, followed by cries of "John, John" and "Oh my god," a sound which could be the telephone dropping, and more cries until the victim's apparent death. The tape ends with the somewhat indistinct statement of the dispatcher, "they're really going at it Tom, you'd better hustle."

Defendant contends that, as he admitted that he had stabbed and killed his wife, the only issue at trial was whether he was legally sane when the stabbing occurred. Defendant argues that as the tape and bloody clothes of the victim were not probative of this issue and were gruesome, highly inflammatory and prejudicial to defendant, they should not have been admitted and that the playing of the tape and display of the bloody clothes denied him a fair trial. He cites *People v. Garlick* (1977), 46 Ill. App. 3d 216, 360 N.E.2d 1121, which held that

the admission of a gruesome photograph of the victim's head wound was error where the defendant both admitted shooting the victim and had raised the insanity defense so that the photograph was not probative of any issue in the case, and *People v. Coleman* (1983), 116 Ill. App. 3d 28, 451 N.E.2d 973, where the admission of a gruesome color slide of a murder victim's decomposing body also was held to be improper.

On the facts of this case, we find no error in the admission of the tape recording and the bloody clothing. It is well established in Illinois that sound recordings, which are otherwise competent, material and relevant, are admissible into evidence if a proper foundation has been established to assure the authenticity and reliability of the recordings. (*People v. Melchor* (1985), 136 Ill. App. 3d 708, 711, 483 N.E.2d 971.) Here, no foundation objection was raised regarding the tape recording. The tape was also clearly material and relevant. The appellate court has allowed electronically recorded evidence to be played for the jury despite the introduction of identical oral testimony. (*People v. Robinson* (1982), 104 Ill. App. 3d 20, 26-27, 432 N.E.2d 340; *People v. Nahas* (1973), 9 Ill. App. 3d 570, 578, 292 N.E.2d 466; see *People v. Williams* (1985), 109 Ill. 2d 327, 336-38, 487 N.E.2d 613.) Despite defendant's contention that the tape lacked probative value because he admitted committing the crime, it is undisputed that a plea of not guilty puts all aspects of the charge in issue, and the State may prove their case with any evidence they desire, notwithstanding the defendant's willingness to stipulate to any given fact. (*People v. Wright* (1974), 56 Ill. 2d 523, 531, 309 N.E.2d 537; *People v. Tyler* (1984), 128 Ill. App. 3d 1080, 1095, 471 N.E.2d 968.) Evidence of the crime may be properly utilized even though a defendant admits the crime but pleads insanity. *People v. Mireles* (1979), 79 Ill. App. 3d 173, 199, 398 N.E.2d 150.

The tape recording here was the most probative evidence available of the actual commission of the crime. Gruesome and inflammatory evidence may be admitted provided that it is probative of one or more issues in a homicide investigation, depicts the amount of force used in the crime, or tends to corroborate or dispute the testimony of the pathologist or other witnesses. (*People v. Cleveland* (1986), 140 Ill. App. 3d 462, 472, 488 N.E.2d 1276.) Although the police officers' testimony and defendant's testimony and statement also tended to prove the commission of the crime, evidence may properly be admitted even if gruesome and cumulative to oral testimony covering the same issue. (*People v. Foster* (1979), 76 Ill. 2d 365, 377-78, 392 N.E.2d 6; *People v. Minnis* (1983), 118 Ill. App. 3d 345, 359, 455

N.E.2d 209.) The tape can also be considered relevant to defendant's insanity defense by showing how the killing occurred and by providing the jury with information it needed to determine the weight to give to the expert testimony on sanity. (See *People v. Cooney* (1985), 136 Ill. App. 3d 989, 1002, 454 N.E.2d 802.) The brutal nature of the killing as shown by the victim's cries on the tape, is probative of the weight to be given defendant's statements that he killed his wife to save her from the problems of the world and old age.

█ It is true that the admissibility of evidence may also depend upon whether the probative value outweighs its prejudicial effect to the defendant. (*People v. Monroe* (1977), 66 Ill. 2d 317, 323, 362 N.E.2d 295; *People v. Frazier* (1984), 129 Ill. App. 3d 704, 709, 472 N.E.2d 1183.) However, evidence which is otherwise relevant will not be excluded merely because it may prejudice the accused (*People v. Rachel* (1984), 123 Ill. App. 3d 600, 605, 462 N.E.2d 959) or because it might arouse feelings of horror or indignation in the jury (*People v. Foster* (1979), 76 Ill. 2d 365, 375-76, 392 N.E.2d 6). It is the function of the trial judge to weigh the probative value and potential prejudicial effect of such evidence. (*People v. Greer* (1980), 79 Ill. 2d 103, 117, 402 N.E.2d 203.) The exercise of that discretion will not be interfered with unless there has been an abuse to the prejudice of the defendant. *People v. Williams* (1983), 97 Ill. 2d 252, 291, 454 N.E.2d 220.

The trial judge listened to the tape and determined that it was probative and could be played for the jury. His determination will not be reversed on appeal. This is especially true in light of the fact that it has been recognized that the effect of prejudicial or inflammatory evidence depends on the circumstances of the case. (*People v. Gacy* (1984), 103 Ill. 2d 1, 86, 468 N.E.2d 1171.) It would be hard to determine that the nature of the tape recording was highly prejudicial to defendant when the jury was also confronted with the defendant's own description of the stabbing, the testimony of the police officers who found the body within minutes of the killing, and the photographs of the victim's body and the bloody scene. In view of all this evidence, we are not prepared to say that the playing of the tape recording was so prejudicially inflammatory as to deny defendant a fair trial. See *People v. Jones* (1982), 94 Ill. 2d 275, 293, 447 N.E.2d 161; *People v. Greer* (1980), 79 Ill. 2d 103, 116-18, 402 N.E.2d 203.

Defendant also contends that the tape was played beyond an agreed stopping point so that the dispatcher's comment was heard. He argues that this was prejudicial as it reinforced the State's theory at trial that the killing was a domestic confrontation that had gotten

out of hand. While the record indicates an apparent informal agreement between counsel that the tape would not be played beyond a particular point, the dispatcher's statement was simply based on her justifiable perception that someone should get there as fast as possible. (*Cf. People v. Lang* (1982), 106 Ill. App. 3d 808, 812, 436 N.E.2d 260.) This comment, even assuming it was erroneously played to the jury, was not prejudicial to defendant.

Also in relation to the tape recording, defendant argues that the prosecutor's remark following the playing of the tape, "[a]ny members of the jury wish to hear that again? We can play it again," amounted to a sarcastic comment designed to elicit an immediate reaction of revulsion from the jurors by asking them to consider the prospect of enduring a second exposure to the recording. The State responds that the comment, while admittedly inartfully phrased, was only made with the purpose of making sure that the jurors heard the tape clearly as the tape does contain several garbled, unintelligible portions. As the judge promptly ruled that the tape would not be played again, no prejudice to defendant resulted from the comment. See *People v. Evans* (1984), 122 Ill. App. 3d 733, 739, 461 N.E.2d 634.

▇▇▇ Defendant contends, in addition, that the display of the victim's bloodstained clothes during the testimony of police officer Stiegemeyer was prejudicial error. Generally, physical evidence may be admitted provided there is proof to connect it with the defendant and with the crime. (*People v. Miller* (1968), 40 Ill. 2d 154, 159, 238 N.E.2d 407; *People v. Givens* (1985), 135 Ill. App. 3d 810, 819, 482 N.E.2d 211.) The bloodstained clothes were relevant to the crime charged and were properly admitted (see *People v. Pittman* (1973), 55 Ill. 2d 39, 60, 302 N.E.2d 7; *People v. Stewart* (1984), 122 Ill. App. 3d 546, 549, 461 N.E.2d 591) even though defendant was raising an insanity defense (*People v. Parisie* (1972), 5 Ill. App. 3d 1009, 1038-39, 287 N.E.2d 310). The clothing did not go to the jury during their deliberations, and the display of the clothing during the officers' testimony was not an abuse of the trial court's discretion.

▇▇ The second issue raised by defendant is whether he was improperly precluded from asking prospective jurors certain questions regarding the insanity defense and personal physical disabilities, thereby preventing him from discovering in a reasonable manner whether the prospective jurors were biased against his defense and depriving him of a fair trial. Defendant contends that he should have been allowed to question the prospective jurors as to whether they had any concerns regarding the consequences of a verdict of not

guilty by reason of insanity and whether they or members of their families had suffered a physical disability and consequent unemployment. There was no abuse of discretion in not allowing either question.

■ While it is clearly true that parties have the right to have jurors examined concerning the insanity defense when it is involved in a case (*People v. Stack* (1986), 112 Ill. 2d 301, 313, 493 N.E.2d 339), defendant here concedes that the parties were permitted to ask questions regarding the prospective jurors' general attitudes toward the insanity defense. This was all that was necessary and proper to assure the selection of a jury which was impartial on the issue of defendant's sanity. (*People v. Liberg* (1985), 138 Ill. App. 3d 986, 989, 486 N.E.2d 973; see also *People v. Durham* (1986), 142 Ill. App. 3d 473, 482-83, 491 N.E.2d 832.) Supreme Court Rule 234 provides that during *voir dire* "[q]uestions shall not directly or indirectly concern matters of law or instructions." (103 Ill. 2d R. 234; *People v. Morgan* (1986), 112 Ill. 2d 111, 129, 492 N.E.2d 1303.) The law does not permit the jury to be preeducated as to the consequences of a verdict of not guilty by reason of insanity (*People v. Liberg* (1985), 138 Ill. App. 3d 986, 989, 486 N.E.2d 973), so a question as to concerns about the consequences of such a verdict was properly not allowed.

■ The question regarding physical disabilities of jurors or their families was also properly excluded. While an attorney on *voir dire* examination of jurors has a right to make such reasonable inquiry as will permit him to intelligently exercise his right of peremptory challenge, the extent to the proper exercise of his right lies within the judicial discretion of the trial court. (*People v. Morgan* (1986), 112 Ill. 2d 111, 129, 492 N.E.2d 1303.) The question which sought to discover whether jurors or members of their families had suffered a physical disability and consequent unemployment improperly tended to highlight aspects of defendant's case rather than expose bias. (See *People v. Chamness* (1984), 129 Ill. App. 3d 871, 874, 473 N.E.2d 476.) The court's ruling was within its broad discretion in determining the scope of the *voir dire*. (See *People v. Williams* (1985), 137 Ill. App. 3d 736, 745, 484 N.E.2d 1191.) As the trial court properly allowed questions to discover possible bias toward the insanity defense during the lengthy *voir dire* in this case, there was no abuse of discretion in refusing to ask the two questions proposed by defendant.

Defendant's final contention is that testimony elicited by the prosecution on cross-examination of defense witness Paulette Botteron and the defendant resulted in substantial prejudice to defendant.

During the cross-examination of defendant, he was asked if he had

ever hit his wife with a crutch and answered, "I don't remember." The record reveals that the State failed to produce any evidence of this incident after defendant answered he could not remember it.

Defendant contends, citing *People v. Nuccio* (1969), 43 Ill. 2d 375, 253 N.E.2d 353, and *People v. Giangrande* (1971), 101 Ill. App. 3d 397, 405, 428 N.E.2d 503, that it is improper for the prosecution to make an unsupported insinuation of misconduct on cross-examination without producing supporting evidence in response to a denial of misconduct. Reversal is required, however, only where the insinuations are substantial, repeated, and definitely prejudicial. (See *People v. Hawkins* (1975), 61 Ill. 2d 23, 28, 329 N.E.2d 221.) This is not the case here.

■ Unlike the situation in *Nuccio*, only one question was asked regarding the incident so there was no extended pattern of unsupported insinuation (see *People v. White* (1985), 134 Ill. App. 3d 262, 278, 479 N.E.2d 1121), and defendant did not deny that the incident took place but only answered that he didn't remember (see *People v. Carlson* (1980), 79 Ill. 2d 564, 579-80, 404 N.E.2d 233). Further, *Nuccio* only applies where the guilt of the accused is not manifest, but is dependent upon the credibility accorded to defendant's testimony and that of the witnesses who testify on his behalf. (*People v. Del Vecchio* (1985), 105 Ill. 2d 414, 442, 475 N.E.2d 840.) Here, there was other evidence presented of domestic quarrels and physical abuse, and the prosecution did not refer to this incident during closing argument. Any error, therefore, was not prejudicial to defendant.

■ Next, on cross-examination of Paulette Botteron, she was asked if she had advised her mother to get a divorce and answered "yes." Defendant does not contend that this was hearsay evidence, but argues that he was prejudiced by this testimony as the jury would infer that the marriage was troubled and violent and that the killing of the victim merely constituted an escalation in the degree of domestic violence otherwise present in her relationship with defendant. There is no merit to this contention. Defendant, on direct examination, stated that his wife told him that his daughter Paulette had advised her to get a divorce and on cross-examination admitted that he hit his wife once. State witnesses testified without objection regarding an incident of physical violence between defendant and the victim and regarding statements made by defendant that he wished his wife were dead. Further, defendant's expert witness, Dr. Eric Ostrov, testified that there was some evidence of physical abuse by defendant toward his wife.

The scope of cross-examination rests largely in the discretion of

the trial court, and its ruling will be overturned only when an abuse of discretion results in manifest prejudice to the defendant. (*People v. Wright* (1985), 111 Ill. 2d 128, 149, 490 N.E. 2d 640.) Almost every aspect in a defendant's life is relevant when the defense of insanity is raised, and the admission of testimony of prior violent acts by the defendant is therefore not necessarily precluded. (*People v. Buggs* (1986), 112 Ill. 2d 284, 290, 493 N.E.2d 332.) Here, the complained-of testimony was relevant and properly allowed, and, in light of the other testimony regarding domestic violence and marital problems between defendant and the victim, no prejudice has been shown.

For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.

Affirmed.

NASH, P.J., and UNVERZAGT, J., concur.