THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES FOSTER, Defendant-Appellant.

Fifth District   No. 5—88—0465

Opinion filed March 14, 1990.

William A. Schroeder, of Carbondale, and Brocton D. Lockwood, of Marion, for appellant.

Charles Garnati, State's Attorney, of Marion (Kenneth R. Boyle, Stephen E. Norris, and Gerry R. Arnold, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE LEWIS delivered the opinion of the court:

Defendant, Charles Foster, was convicted by a jury of one count of aggravated criminal sexual assault of A.B. and one count of aggravated criminal sexual abuse of A.B., but was acquitted of one count of aggravated criminal sexual abuse of C.F. on May 3, 1988. The defendant filed a post-trial motion on May 26, 1988, which was subsequently denied by the circuit court. The court sentenced the defendant to concurrent sentences of 12 years' incarceration for his conviction of aggravated criminal sexual assault and seven years' incarceration for his conviction of aggravated criminal sexual abuse. In addition to his jail sentences, the court ordered the defendant to pay restitution in the amount of $2,500 to the victim for her resultant psychological harm. The defendant appeals his convictions and that portion of his sentencing order imposing restitution.

On appeal, the defendant raises the following issues: (1) that the circuit court erroneously denied his motion to suppress his statements of July 10, 1987; (2) that the court committed reversible error in not removing a prospective juror for cause, thereby forcing the defendant to use a peremptory challenge for removal of this juror; (3) that the court erred in allowing evidence of the defendant's prior sexual activities with the victim as this prejudiced the defendant; (4) that the defendant was not proven guilty beyond a reasonable doubt; (5) that the jury was not properly instructed on the elements of the charges against the defendant; and (6) that the court's imposition of restitution as part of the defendant's sentence was improper and an abuse

of discretion. Because the defendant has raised the propriety of the court's ruling on his motion to suppress his statements and has raised the issue that he was not proven guilty beyond a reasonable doubt, it is necessary to set forth a statement of facts of this case. However, our recitation of the facts will be confined to that evidence presented in regard to the defendant's convictions for aggravated criminal sexual assault and aggravated criminal sexual abuse of A.B., and will not include that evidence presented relating to the charge of aggravated criminal sexual abuse of C.F., since the defendant was acquitted by the jury of this charge.

At the hearing on the defendant's motion to suppress, Stephen E. Reenan, an investigator for the Illinois Department of Children and Family Services (hereinafter DCFS), testified that on the morning of July 6, 1987, he received a report from Springfield, Illinois, that the defendant had allegedly sexually abused W.D., a minor. As a result of this report, Reenan contacted the defendant by telephone, and later that day, without disclosing to the defendant that he was coming to see him, Reenan went to the defendant's home to interview him about the report.

Reenan testified that DCFS procedures required him to notify the State's Attorney or an appropriate law enforcement agency when he was to interview a person such as the defendant. Therefore, on July 6, 1987, Reenan notified Gordon Hopp of the Anna police department of his impending visit to the defendant on that day, and Hopp accompanied Reenan to the defendant's home.

At the defendant's residence in Anna, Illinois, in Union County, Illinois, Reenan introduced himself and Officer Hopp to the defendant, and explained to the defendant that he was required to ask the defendant questions about the report of the defendant's alleged sexual abuse of W.D., the defendant's stepdaughter, which Reenan had received. Before interviewing the defendant, Reenan gave the defendant a form letter which gave the defendant's name, the victim's name and a brochure detailing the defendant's rights and explaining the investigation. After these preliminaries, the defendant agreed to talk with Reenan.

During the interview, Reenan sat with the defendant and Officer Hopp at the defendant's dining room table. Although Officer Hopp was present, it was Reenan who conducted the interview. The defendant was not given his *Miranda* warnings (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602) prior to this interview, and when questioned about the report Reenan received, the defendant made admissions regarding his sexual relationship with

W.D. At the time of this interview, Reenan was unaware of any case against the defendant regarding his activities with A.B. and C.F., the victims of the case *sub judice*. Reenan's interview with the defendant lasted approximately 1 hour and 15 minutes, and at no time during the interview did the defendant ask to terminate the interview. Reenan stated that neither he nor Officer Hopp threatened or made promises to the defendant.

The next morning, on July 7, 1987, Reenan talked to the Union County State's Attorney about the possibility of charges being filed against the defendant based upon the report of the defendant's sexual abuse of W.D. Reenan's report of this call, which was admitted into evidence, showed that Reenan was advised by the State's Attorney that if the case against the defendant was a substantial one, he would file charges against the defendant. The State's Attorney also told Reenan that the case might be dismissed because the defendant had not been given his *Miranda* warnings prior to the interview of July 6, 1987. In this same note, Reenan indicated that his goal for the defendant was to get him into a treatment program.

Also on July 7, 1987, Reenan received a telephone call from Kathy Evans, a DCFS investigator from the Marion, Illinois, office. Evans advised Reenan that another DCFS worker's granddaughter might have been sexually abused by the defendant.

Later this same day, the defendant called Reenan at his DCFS office. Reenan stated that the defendant did not make any statement to him about A.B. or C.F. during this conversation. The defendant indicated to Reenan that he was willing to participate in any treatment program and that he needed help. Reenan did not tell the defendant that he was going to be prosecuted for his activities.

Reenan next talked to the defendant on July 9, 1987, when the defendant called him on the telephone. During this telephone conversation with the defendant, Reenan spoke with the defendant's mother. The defendant's mother asked Reenan if the defendant needed an attorney, and Reenan told her that the defendant did not need an attorney to talk to him as he was not a police officer. When Reenan resumed his telephone conversation with the defendant, the defendant disclosed his sexual involvement with A.B. to Reenan. At this time, Reenan scheduled a meeting between himself and the defendant for the following day. Reenan denied that he made the defendant any promises or threatened the defendant during this conversation.

On July 10, 1987, at 1 p.m., the defendant came to the DCFS offices in Anna, Illinois, for the interview with Reenan. Also present at this meeting was Officer Thrailkill, an Illinois State Police officer.

Reenan explained that he had had nothing to do with having Officer Thrailkill present, and Reenan had been unaware that a police officer would be present at this interview. According to Reenan, at the beginning of the interview, Officer Thrailkill gave the defendant his *Miranda* warnings. Reenan believed that the defendant understood his rights, and Reenan witnessed the defendant's signing of the rights waiver form. After the defendant signed the waiver form, Reenan and Officer Thrailkill proceeded with the interview with Officer Thrailkill asking the defendant most of the questions. The interview lasted approximately four hours, and at no time before or during the interview did the defendant request an attorney or ask to terminate the interview. During the interview, the defendant asked for a drink and to go to the bathroom, and both of these requests by the defendant were granted. Reenan stated that the defendant was not under arrest at the time of the interview, and at the end of the interview, the defendant left. In the interview, the defendant confessed that he had sexually molested A.B. over the past few years, and he gave a chronology of his sexual involvement with A.B. Neither Reenan nor Thrailkill promised the defendant that he would get into a treatment program and neither told the defendant that he would not be prosecuted.

Reenan stated that it was the defendant who mentioned that he needed help and that he had a problem, to which Reenan responded by citing possibilities, including a sexual abuse treatment program. Reenan admitted that he probably told the defendant that as part of his assessment for treatment the defendant would have to make a "clean breast" of everything, but that the defendant was not required to cooperate "in that fashion" to get into a treatment program. However, Reenan explained that it was not he who determined if the defendant could secure treatment and that he likewise did not determine eligibility for participation in a treatment program.

Sergeant Edwin Thrailkill, an agent with the Illinois State Police, testified at the suppression hearing that he was present at the defendant's interview at the DCFS offices on July 10, 1987. Before the interview, Officer Thrailkill identified himself to the defendant and gave the defendant his *Miranda* warnings. Officer Thrailkill corroborated Reenan's testimony that the defendant signed a rights waiver form and that the defendant agreed to talk with them. He too testified that the defendant did not ask for an attorney; that the defendant appeared to be physically able during the interview; that the defendant did not ask to stop the interview at any time; and that any request made by the defendant during the four-hour interview was honored.

Officer Thrailkill also stated that neither he nor Reenan told the defendant that he would not be prosecuted criminally, and they did not promise the defendant anything in order to obtain the defendant's statement. Officer Thrailkill could not recall discussing treatment programs with the defendant, but he did remember that the defendant stated he hoped he could get into a treatment program.

Officer Thrailkill testified that he normally was not assigned to cases of this nature, but that he was assisting Officer Pam Burke, another State Police officer, who had asked him on July 8, 1987, to interview the defendant for her. Officer Thrailkill did not know prior to the interview with the defendant that the defendant had had other previous interviews, although he was aware that the children involved had been interviewed. Officer Thrailkill had known that Reenan had gone to the defendant's home in Anna with another police officer. On cross-examination, Officer Thrailkill stated that he did not know that Reenan had represented to the defendant that an attorney was not needed at the interview.

Gordon Hopp, a police officer for the City of Anna, testified that on July 6, 1987, at Reenan's request, he accompanied Reenan to the defendant's home. According to Hopp, Reenan had been informed that the defendant could be violent, and Reenan wanted Hopp along for protection. At the defendant's home, the defendant permitted Officer Hopp and Reenan to come into his house. Reenan told the defendant why they were there and proceeded to interview the defendant. Officer Hopp stated that he did not place the defendant under arrest at any time prior to, during or after the interview. Officer Hopp did not obtain a signed statement by the defendant, and he did not give the defendant his *Miranda* warnings. Reenan conducted the interview with the defendant, and Officer Hopp did not take any notes during the interview. Officer Hopp recalled Reenan questioning the defendant about W.D., but he did not recall any discussion of other children. Officer Hopp was unaware of other crimes by the defendant in another county at the time of the interview.

The defendant's mother, Barbara Foster, testified that she became aware that the defendant was involved in a problem in Union County sometime around the 7th or 8th of July. She and her husband discussed hiring an attorney for the defendant, and on July 8, 1987, she called an attorney and made an appointment for the defendant for July 10, 1987, at 4 p.m. Barbara stated she was at home on the morning of July 9 when the defendant and Reenan talked on the telephone. She corroborated Reenan's testimony that she talked to Reenan during that conversation with the defendant, and that she asked Reenan

if the defendant needed an attorney. According to her, Reenan told her the defendant did not need an attorney and that Reenan stated that "Chuck [the defendant] is very cooperative. He wants to keep his family together, and I am getting him into a [treatment] program."

Barbara testified that she again talked to Reenan on the morning of July 10, 1987, and that the defendant was not at home when Reenan called. She explained that Reenan told her he wanted to arrange a meeting with the defendant. When the defendant returned home, Barbara told the defendant of Reenan's call. The defendant returned Reenan's call and agreed to meet Reenan that day at 1 p.m. Barbara stated that Reenan did not indicate to her that morning that the defendant needed an attorney. She testified that she was led to believe that the defendant needed to cooperate fully to receive treatment. Barbara admitted that she did not tell Reenan that the defendant had an appointment with an attorney on July 10, 1987.

Donald Brandon, an attorney-at-law, testified that the defendant's family contacted him on July 8, 1987, and that he set up an appointment to see the defendant on July 10, 1987, at 4 p.m. He was unaware of the problem the defendant wished to see him about or that the defendant was going to give a statement to the investigators. Before the defendant's meeting with Reenan occurred, he was not told that the defendant had a meeting either by the defendant's mother or by the defendant.

At the jury trial, the first witness to testify was A.B. Prior to her testimony before the jury, A.B. was questioned to determine her competency to testify, and she was found competent to testify. A.B. testified that she was 12 years of age, that she was in seventh grade at Marion Junior High School, and that she lived with her grandparents and her half-brother, C.F., in Marion, Illinois.

A.B. testified that the defendant was the father of C.F., her half-brother, and at one time, the defendant was her stepfather. When her mother was married to the defendant, A.B. had lived with the defendant, which was before and during the time she was in kindergarten. She knew that her mother and the defendant were now divorced, but she could not recall when this occurred. After the divorce, A.B. continued to see the defendant approximately two to three times a month at his home in Freeman Spur, Illinois, in Williamson County. On her visits, she and the defendant would go fishing and would occasionally go shopping. A.B. testified that she did not regularly see her natural father, and, at most, she saw her natural father three times a year. A.B. considered the defendant her father and called him "Dad," even though she knew he was not her real father.

A.B. related the lightning bolt incident which occurred on a day she was visiting with the defendant. On that day, she, C.F. and the defendant went fishing. She recalled that it was in the spring, and that the weather was not cold and it was not hot. She could not recall what she was wearing on that day; however, on cross-examination, she denied that she was wearing shorts, as she rarely wore shorts when she went fishing even if the weather were warm. She was also wearing underwear that day.

When they had arrived at the pond to fish that day, the weather had not looked like rain, but suddenly, the weather turned cloudy and a lightning bolt struck nearby. A.B. was not struck by the lightning bolt and she did not fall to the ground, but she was stunned. A.B. recalled that the defendant was knocked down by the force of the lightning bolt, but she was unable to recall whether her brother fell down. A.B. started to cry after this occurred, but she was not hurt. The defendant led them up a path to the car, and once they were inside the vehicle, the defendant went back to retrieve the fishing equipment they had left behind.

When the defendant returned to the car, they sat for a short time. During this time, the defendant did not examine her or C.F., but he did ask her and her brother if they were hurt, to which A.B. responded that she was fine and that the lightning bolt had just stunned her.

After leaving the pond, A.B. was uncertain if they returned directly to the defendant's home or whether they first stopped at the defendant's parents' home. She testified that if they stopped at the defendant's parents' home, they did not stay long. Next, they went to the defendant's home, whereupon the defendant told C.F. to take a bath and told A.B. to take a shower. A.B. went downstairs to the shower. Subsequently, the defendant followed her downstairs, he again asked her if she were hurt, and A.B. again told the defendant she was fine; however, the defendant insisted on examining her to be sure. A.B. did not ask the defendant to examine her. A.B. also stated she was not dirty from the lightning bolt incident, because she hated to be dirty and she would have wiped any dirt off of her.

The defendant removed A.B.'s clothes, but he remained dressed. After removing her clothing, the defendant briefly checked her arms. The defendant next touched her breasts, and his examination of this area was more prolonged than his examination of her arms or legs. Next, the defendant had her sit on the floor, spread her legs in a "V," and examined her upper thighs and her "private parts." A.B. thought that the medical term for her "private parts" was vagina. According

to A.B., the defendant spread her vagina with his fingers, rubbed that area, and placed his finger inside her "a little bit but not much." A.B. testified that the defendant's inspection did not take a "tremendous amount of time[,] but it wasn't like all of a sudden and it was over either. It took a while. But that's what he checked the most." After the defendant ran his finger around her vagina, he looked at A.B.'s vagina "for a while," and then the defendant told her she could get dressed. A.B. stated that no one was present when the defendant conducted his examination, that she did not want the defendant to do this, and that the defendant's actions made her feel uncomfortable. After she had dressed, the defendant, her brother and she returned to the defendant's parents' home. A.B. denied that she had any grass or debris in her vagina.

A.B. admitted that the defendant had touched her vagina in a similar manner on approximately 10 or more occasions before this incident, and that he started this when she was in the second grade. A.B. was living with her grandparents at that time, but these incidents would occur when she visited the defendant. A.B. testified that the defendant would tell her that he wanted to make sure she was clean as an excuse for his behavior. A.B. testified that she had seen the defendant's penis, and when she was younger, the defendant would have A.B. rub lotion on his penis. This activity did not occur more than five times. The defendant would also give her long kisses.

The next witness was C.F., who was questioned for his competency outside of the presence of the jury. He was found to be competent to testify. He testified that he was nine years old and that he lived with his grandparents and his half-sister, A.B. The defendant is his father. He too recalled the incident of the lightning bolt. He corroborated that on that day they were fishing and a lightning bolt struck nearby. He stated that he fell down, but he did not see what happened to the defendant or his sister. He said he was probably hurt because he was "shocked." C.F. did not remember the defendant asking them if they were hurt, and C.F. did not tell the defendant he was burned. After the lightning bolt hit, the defendant, A.B. and he returned to the car and got inside. The defendant then returned to get the fishing equipment they had left behind. They left the pond and went to the defendant's parents' home. C.F. recalled that he wore a long-sleeved shirt and pants on that day.

Steve Reenan testified that he interviewed the defendant in the DCFS offices on July 10, 1987. Officer Thrailkill was also present at this interview. Before the interview commenced, Officer Thrailkill gave the defendant his *Miranda* warnings. During the interview, the

defendant discussed the lightning bolt incident. The defendant told Reenan and Officer Thrailkill that sometime in May of 1986 he had taken C.F. and A.B. fishing at a pond near Goreville, Illinois. On this day, lightning struck nearby, and the defendant and the children were knocked to the ground. The defendant stated that mud and debris had gotten on them because of this. The three of them left the pond and went home, at which time the defendant had the children undress so that he could examine them for "damage or trauma." The defendant told Reenan that he did a visual inspection of his son, but the defendant admitted that he inserted his little finger approximately one-half inch into A.B.'s vagina to clean out mud or "some weed material."

The defendant further admitted to Reenan that he had had sexual contact with A.B. prior to May of 1986, and that these contacts began when A.B. was approximately three years old. The first sexual contact the defendant had with A.B. consisted of A.B. placing her hand on the defendant's penis. After this incident, the defendant told Reenan that he would take baths with A.B. The defendant told Reenan that when A.B. was four years old, she applied lotion to his body; when A.B. was six years old, the defendant fondled A.B.'s vagina on two occasions; and that when she was nine years of age, A.B. rubbed lotion on his penis. On one occasion, in 1982, when the defendant and A.B. were naked, they rubbed lotion on each other and eventually the defendant positioned himself on top of A.B. and he simulated intercourse with his penis in contact with her vagina. The defendant admitted that he ejaculated onto the bed on this occasion. On another occasion, the defendant had kissed A.B. over her entire body, including her vagina.

On cross-examination, Reenan testified that the defendant did not state that he was sexually aroused on the day of the lightning bolt incident by his activities with A.B. However, the defendant had admitted that he had been sexually aroused during previous encounters with A.B.

Edwin Thrailkill testified that he was a sergeant with the Illinois State Police and that he interviewed the defendant on July 10, 1987, at the DCFS offices in Anna, Illinois. Officer Thrailkill read the defendant his *Miranda* rights, after which the defendant agreed to talk to him. Officer Thrailkill corroborated Reenan's testimony regarding the defendant's statements about the lightning bolt incident in May of 1986. Officer Thrailkill testified to the defendant's statements about touching A.B.'s vagina with his finger on that day to remove debris from the area. Officer Thrailkill's testimony of the defendant's statements regarding other previous sexual contacts with

A.B. paralleled Reenan's testimony. Officer Thrailkill stated that the defendant had admitted that the defendant's sexual contacts with A.B. from the time she was four years old until she was nine years old had sexually aroused the defendant. However, the officer did not ask the defendant and the defendant did not indicate in his statement that he had been sexually aroused on the day of the lightning bolt incident.

The defendant called the grandmother of A.B. and C.F. to testify as a hostile witness. She testified that she was employed by DCFS. She denied having investigated this case, but she had contacted the State's Attorney regarding the criminal charges filed. She stated that she is the legal custodian of A.B. and C.F. Prior to the current charges, she had believed the defendant had taken proper care of C.F., and she had allowed A.B. visits with the defendant and her brother. She was unaware that the defendant had been sexually abusing A.B. for years.

Kendra Ventura testified that she was the defendant's sister. On the day of the lightning bolt incident, she and her family were visiting the defendant's parents' home. She recalled that her other brother, his wife, and their three children were also there that day. That day, the defendant and the two children returned to her parents' home after fishing. The children were wet, nervous, excited and glad to be home. According to Kendra, the children complained that their legs tingled. The defendant and the two children went to the defendant's home to clean up and to change. The defendant and the children were gone about 15 minutes, and when they returned, the children were clean and had changed clothes. She admitted that there were three adult females at her parents' home that day, but that the defendant took the children to his home alone. She also admitted that the children were not taken to a doctor or to a hospital.

Barbara Foster, the defendant's mother, repeated her testimony from the defendant's hearing on his motion to suppress regarding her conversations with Reenan about whether the defendant needed an attorney. Barbara testified that on the day of the lightning bolt incident, her children and their families were at her home for dinner. The defendant, A.B. and C.F. had gone fishing, and when they returned, they were very excited. The children told her they "had been struck by lightning." Barbara recalled the children telling her that the lightning had struck the defendant and had thrown him into the air, and that they thought the defendant was dead. C.F. told Barbara that "the lightning went into his stomach like a knife," and A.B. stated that she was tingling all over. When the children and the defendant

arrived at her home, they were wet, muddy, and had grass on them. She recalled their dishevelled state as they came in across her carpet in the living room.

The defendant complained to Barbara that his arm and leg hurt him, so Barbara urged him to take himself and the children to the hospital, but the defendant refused. She told the defendant that he should check the children for burns.

Barbara corroborated Kendra's testimony that the defendant and the children went to the defendant's home to clean up and to change clothes, and that they were gone for approximately 15 minutes. Later that day, after dinner, everyone played games, but the defendant laid on the couch as he did not feel well. She testified that the children did not see a doctor after this incident as they "seemed fine."

The defendant testified that he was 32 years of age and a coal miner for nearly 10 years. He graduated from high school and attended college, where he majored in accounting, but he quit college in 1977. The defendant admitted that he called Reenan on July 9, 1987, to inquire about getting into a therapy program. The defendant wanted in a treatment program as he was having problems with his relationship with his wife and his children, and he wanted to get his family back together. When the defendant talked to Reenan on July 9, 1987, he had not discussed the consequences of his problems with an attorney. The defendant stated his mother had considered the necessity of an attorney, but the defendant said he trusted Reenan.

On July 9, 1987, the defendant was told about different programs in which he could participate. In order to get into these programs, the defendant was to discuss all his problems. According to the defendant, Reenan told him he would contact the defendant about when they would meet for an interview, and on July 10, 1987, Reenan called the defendant, and they arranged to meet that day at the DCFS offices in Anna.

At the defendant's interview on July 10, 1987, Officer Thrailkill was also present. The defendant admitted that Officer Thrailkill gave him his *Miranda* warnings and that he agreed to talk. The defendant had heard Officer Thrailkill's testimony and he agreed that the officer's testimony was correct. The defendant denied that he had had any sexual activity with A.B. after she was in second grade.

The defendant testified to the lightning bolt incident. He and the children were fishing at a pond near Goreville, Illinois, that day. The weather was warm but not too hot, and while they were fishing, a lightning bolt hit a tree five yards away from him and about 10 or 15 yards from the children. The lightning bolt knocked the defendant

onto his back and stunned him. When he got up, he went to the children, who were crouched down. The children were hysterical, and he led them back to the car; however, the defendant returned to the pond to get the fishing equipment they had left behind.

After they left the area, they returned to the defendant's parents' home. When they arrived, the children were excited, but the defendant was withdrawn as his right side hurt him. He admitted that his mother suggested that he go to the emergency room at the hospital, but that he declined to do so.

The defendant took the children to the defendant's house to clean up, and once there, the defendant told the children to undress so he could examine them. The defendant examined C.F. and found that he was unhurt. Next, the defendant examined A.B. while she was nude. He examined A.B.'s back, sides, and her arms, but because A.B. complained her legs were tingling, he had her sit on the floor so he could examine her feet. During this examination, the defendant denied that he touched A.B.'s thighs, but he admitted that he noticed a "dark patch" between her legs, which he wiped away with his finger. The defendant denied that he was sexually aroused when he did this. The defendant admitted that he was unmarried at the time of this incident.

The defendant testified that he understood that he could be prosecuted for his actions, but that he trusted Reenan, and Reenan did not tell the defendant he would be prosecuted. The defendant also admitted that he had told Reenan in their telephone conversation of July 9, 1987, that he had sexually abused A.B. The defendant agreed that he voluntarily went to the meeting with Reenan on July 10, 1987. The defendant stated that Officer Thrailkill was present at the July 10 meeting, that Officer Thrailkill identified himself as a police officer, that he was given his *Miranda* warnings, that he understood his rights, and that he willingly talked to Reenan and Officer Thrailkill.

The defendant testified that Reenan promised him that he could enter a therapy program, but that after the defendant's interview, Reenan told the defendant that Reenan's administrator told Reenan he must "hold off" on this. Reenan told the defendant that it was not Reenan's decision as to whether the defendant was prosecuted, but that Reenan was referring the defendant's case to other people who would make this determination. The defendant was aware that A.B. had talked to DCFS on July 7, 1987, and that she had said the defendant had molested her. The defendant denied that Officer Thrailkill had made any promises to him to obtain his statements.

The defendant admitted that he had been in the "regular course"

of taking baths with A.B. He further stated that he let A.B. touch his penis and that the baths with A.B. sexually aroused him. He also admitted that he let A.B. rub lotion on his body and his penis. He told of the incident in 1982 when he simulated sexual intercourse with A.B. after rubbing lotion on her.

The defendant's father, Charles Foster, Sr., testified that he was a retired military man, but that he currently was employed as coordinator of the electrical-electronics program at Rend Lake College. He recalled the day of the lightning bolt incident. He stated that the defendant and the children returned from fishing that day, and that the children were excited about the incident. Charles described C.F. as a storyteller, and he thought the children were competing to see who could tell the story about the lightning bolt the best. The defendant came into the house after the children, and Charles stated that the defendant was hurting. Charles recalled that A.B. wore shorts that day and that C.F. had muddy shoes. Charles advised the defendant to take himself and the children to the emergency room, but the defendant told him that they were unhurt. Charles also testified that the defendant went to the defendant's home, where the defendant and the children apparently cleaned up, and then returned to Charles' home after 15 or 20 minutes.

Vicki Duncan testified that she was employed by DCFS and that she worked in the Salem, Illinois, office. She first became involved in this case on July 8, 1987, as it was necessary for someone outside of the Marion office to handle it due to the victim's grandmother's involvement. She interviewed both C.F. and A.B. on that day. A.B. told Duncan that on the date of the lightning bolt, the defendant inserted his finger inside her. At Duncan's second interview with A.B., A.B. told Duncan that when A.B. was younger, she had touched and fondled the defendant's penis on several occasions. She admitted that after her first interviews with C.F., there was no credible evidence that the defendant had sexually abused C.F.

The defendant lastly called James Bernhardt to testify. Bernhardt testified as to the defendant's reputation for truth and veracity.

After hearing the evidence, the jury found the defendant guilty of the charges of aggravated criminal sexual abuse and aggravated criminal sexual assault of A.B., but acquitted the defendant of the charge of aggravated criminal sexual abuse of C.F. The defendant filed a post-trial motion which was considered and denied at the defendant's sentencing hearing. The court sentenced the defendant to concurrent terms of 12 years' imprisonment for the aggravated criminal sexual assault conviction and 7 years' imprisonment for the aggravated crim-

inal sexual abuse conviction. Additionally, the court ordered the defendant to pay $2,500 for restitution to the victim. The defendant appeals his conviction and the imposition of the $2,500 restitution order.

The defendant's first issue raised on appeal is that the circuit court improperly denied his motion to suppress his oral statements made to Officer Thrailkill and Reenan on July 10, 1987. The premise on which the defendant's argument is based is that this interview was a custodial interrogation and that it was therefore necessary that he be given his *Miranda* warnings. From this premise, the defendant proceeds to argue that, while concededly the defendant was given his *Miranda* warnings, his statements were inadmissible because he did not knowingly, intelligently, and voluntarily waive his rights, or alternatively, his statements were not voluntarily made as the statements were induced by promises of leniency.

■■ ■ Initially, we must disagree with the defendant that his statements were obtained during custodial interrogation. Whether a defendant is in custody at the time of his interrogation is a factual question that must be determined on a case-by-case basis. Some of the factors which are to be considered in determining whether a statement was made during custodial interrogation include: (1) was the defendant's freedom to depart restricted; (2) did the defendant appear at the interview voluntarily; (3) did the defendant know he was not under arrest; (4) where was the interview held; and (5) what was the extent of the police officer's knowledge and focus of the investigation? (*People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870; *People v. Durham* (1986), 142 Ill. App. 3d 473, 491 N.E.2d 832.) Further, whether an interrogation is custodial is decided upon the totality of the circumstances and upon what a reasonable person would perceive the situation to be. (*Durham*, 142 Ill. App. 3d 473, 491 N.E.2d 832.) A custodial interrogation is not created by the simple fact that a defendant has been given his *Miranda* warnings as a precautionary measure. (*Wipfler*, 68 Ill. 2d 158, 368 N.E.2d 870.) In the case *sub judice*, the record reveals that the defendant was not in custody at the time of his interrogation by Officer Thrailkill as the defendant voluntarily came to the meeting at the DCFS offices; there was no indication that the defendant's freedom to depart from the interview was restricted; there was no evidence presented that the defendant believed he was under arrest; and lastly, the defendant was permitted to leave the offices of DCFS at the conclusion of the interview. In addition, Officer Thrailkill's knowledge of the defendant's actions was extremely limited, and the focus of his questioning indicated that he was

conducting a preliminary investigation. We also note that the defendant was not charged with the offenses of which he now stands convicted until a couple of months after his interview of July 10, 1987, and likewise, the warrant for the defendant's arrest was not issued until October 1987, almost three months after the defendant's statements were obtained. These factors mediate against a finding that the defendant's statements were obtained during custodial interrogation.

Quite simply, the situation presented here is that the defendant made out-of-court statements which did not require that the defendant be administered his *Miranda* warnings as the defendant was not in custody at the time of the statements. (We do note that the defendant was informed of his rights prior to his interview of July 10, 1987, and whether the defendant was properly warned on that date is not an issue here.) Because it was unnecessary that the defendant be given his *Miranda* warnings, the defendant's argument that he did not knowingly waive his rights need not be considered by this court. Nevertheless, had we ruled otherwise and found the administration of the *Miranda* warnings was required, the defendant would not have prevailed in his argument. The defendant does not argue that he did not knowingly or intelligently waive his rights, but he confines his argument to contending that his waiver was not voluntary as his confession was obtained through the coercion and deceit of DCFS investigator Reenan and Officer Thrailkill. The defendant cites the following sequence of events as evidence of this deceit and coercion: On July 6, 1987, the defendant was interviewed by Reenan and Officer Hopp regarding a report of sexual abuse by the defendant against W.D. On July 7, 1987, Reenan had discussed the report of W.D. with the Union County State's Attorney and had been advised that there were difficulties with the defendant's statements of the day before and, therefore, any prosecution initiated on the basis of the defendant's statements may be dismissed. From this discussion with the State's Attorney, Reenan noted that his "goal" was to involve the defendant in a treatment program, which Reenan discussed with the defendant. The defendant also finds it significant that Reenan was notified of the possible abuse of A.B. and C.F. on that date. On July 8, 1987, the defendant's mother made an appointment with an attorney for the defendant to discuss the problems which had arisen in Union County. This same day, Officer Thrailkill was contacted by Officer Pam Burke and requested by her to interview the defendant. On July 9, 1987, the defendant called Reenan to discuss the possibility of his receiving treatment. In the course of this telephone conversation, Reenan talked to the defendant's mother, and when questioned by her as to

whether the defendant needed an attorney, Reenan advised her that an attorney was not needed to speak to him. After his mother's discussion, the defendant proceeded to talk to Reenan on the telephone about his sexual abuse of A.B. The defendant next states in his brief that, on the morning of July 10, 1987, Reenan talked briefly with the defendant's mother during the course of Reenan's trying to reach the defendant. When Reenan spoke to the defendant's mother, Reenan did not indicate to the defendant's mother "that his prior assurances [that the defendant did not need an attorney] were being withdrawn." The defendant goes on to reiterate that later that same morning, the defendant returned Reenan's call and arranged to meet Reenan that afternoon at 1 p.m. The defendant states that at the meeting with Reenan and Officer Thrailkill that afternoon, prior to the defendant being "Mirandized," the defendant discussed "treatment, and the need to get his 'family reunited.'" From this series of events, the defendant appears to contend that because he was not given his *Miranda* warnings before each conversation with Reenan; because of the "lack of custody" at his interviews; because he was not told he would be prosecuted for his misdeeds; and because he had discussed treatment programs with Reenan, he was deceived, or lulled into a false sense of security that he would receive treatment instead of being prosecuted, and this deception caused him to make his statement.

■ The foregoing factors set forth by the defendant do not support a finding that the defendant was coerced or deceived into giving his confession of July 10, 1987. The events of July 6 and July 7, 1987, were concerned with a report of the defendant's sexual abuse of another child, unrelated to this case. Thus, whether the defendant was unable to be prosecuted in another county by another State's Attorney for another of his misdeeds has no bearing upon whether the defendant was misled in this case. Also, it appears that DCFS investigator Reenan was unaware of the reports of child abuse of A.B. and C.F. when he talked to the defendant on July 6, 1987. It is obvious that Reenan could not assure the defendant that he would not be prosecuted for events of which Reenan was unaware.

Similarly, it is unclear from the record as to whether Reenan knew about the reports of abuse on A.B. and C.F. at the time that Reenan talked to the defendant on July 7, 1987. Further, even if Reenan was aware of the abuse of A.B. and C.F., there is no indication in the record that Reenan discussed those cases of abuse with the defendant on that date. Since Reenan did not discuss A.B. and C.F. on that date with the defendant, the defendant could not have known that Reenan knew about those activities and could not possibly have

been misled in regard to whether he would be prosecuted for his misconduct with these children.

The defendant's reliance on the events of July 8, 1987, where his mother contacted an attorney and made an appointment with him for the defendant, provides dubious support of his position that he was coerced and deceived that he would not be prosecuted and that he did not need an attorney. The fact that the defendant's mother contacted an attorney to discuss the problems which had arisen in Union County based on the report of the defendant's sexual abuse of W.D. gives rise to the inference that the defendant's mother had reason to believe that her son's actions were criminal and subject to prosecution. From this inference, it is only logical that the defendant's mother must have discussed this possibility with the defendant, since it was the defendant who was to meet with the attorney. Therefore, the defendant was aware that prosecution for his actions was a possibility.

■■ In considering the events of July 9, 1987, we note that it was the defendant's mother who was advised by Reenan that the defendant did not need an attorney to talk to him. The defendant has not cited nor are we aware of any case law which has held that assurances that counsel is unnecessary to someone other than the defendant negates the voluntariness of a defendant's statements or deceives the defendant. While telling the defendant's mother that an attorney was unnecessary might warrant consideration if the defendant had been a minor, we cannot find that Reenan's statement to the defendant's mother is persuasive where, as here, the defendant was 32 years of age and had some college education. Likewise, since the statement was not made to the defendant, the defendant's suggestion that he was deceived or coerced loses merit.

■■ Further, we do not determine, as the defendant argues, that the defendant's unwarned statement to Reenan of his sexual abuse of A.B. on July 9, 1987, renders the defendant's warned statements of July 10, 1987, involuntary. The defendant, in this portion of his argument, attempts to factually distinguish his case from the United States Supreme Court case of *Oregon v. Elstad* (1985), 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285, in which the Supreme Court held that a previous unwarned statement does not render a subsequent warned statement involuntary. As with *Miranda*, *Oregon* is concerned with custodial interrogation, a situation not present here, and is not directly applicable to this case. The statements made by the defendant on July 9 were not made while the defendant was in custody, but were voluntary out-of-court statements. The evidence shows that it was the defendant who contacted Reenan on July 9, 1987; the state-

ments were made by the defendant during a telephone conversation from his home and not while he was at the DCFS offices or at a police station; the defendant had no reason to believe he was under arrest at the time he made the statements; and the defendant made his statements to Reenan, who was not a police officer. The facts in this case show that the defendant's statements of July 9, 1987, were voluntary. A voluntary out-of-court statement followed by a subsequent voluntary out-of-court statement made 24 hours or more apart does not render the subsequent out-of-court statement inadmissible.

The events of July 10, 1987, to which the defendant refers likewise did not make the defendant's waiver involuntary. The defendant argued that his mother talked to Reenan that morning and that Reenan did not advise her at that time that the defendant may need an attorney. Again, statements to another individual other than the defendant have dubious value under the circumstances of this case. Also, the defendant's mother's testimony regarding the conversations with Reenan on the morning of July 10, 1987, was not corroborated by Reenan, as Reenan did not recall talking to the defendant's mother that day. Additionally, the defendant's parents' telephone bill, submitted as an exhibit, did not reflect that the defendant called Reenan back that morning as the defendant's mother testified he did. The only telephone call to DCFS on the telephone bill shows that a call was made to DCFS at 4:44 p.m. that day. These facts give rise to the inference that Reenan did not call or talk to the defendant or his mother on the morning of July 10, 1987.

Lastly, the testimony of the defendant's interview with Reenan and Officer Thrailkill does not reveal that the defendant's waiver of his rights was involuntary. As we noted earlier, the defendant was not in custody at the time of the interview; the defendant was given his *Miranda* warnings prior to making his inculpatory statements; and the defendant's requests during the interview were honored. Evidence that a defendant was informed of his rights and that he understood them, followed by a confession, gives support to a finding that the defendant knowingly, intelligently and voluntarily waived his rights. (*People v. Torres* (1973), 54 Ill. 2d 384, 297 N.E.2d 142.) Additionally, an express written or oral statement of waiver of a defendant's rights is usually strong proof of the validity of the waiver. (*People v. Rogers* (1988), 123 Ill. 2d 487, 528 N.E.2d 667.) In this case, a written waiver of rights was signed by the defendant; therefore, we find that the defendant voluntarily waived his rights.

Having disposed of the defendant's argument that he did not voluntarily waive his rights both on the merits and on the basis that it

was unnecessary that the defendant be given his *Miranda* warnings, we now turn to a discussion of whether the defendant's statements were voluntary. Regardless of the fact that the defendant's statements were not the product of custodial interrogation, it is, nevertheless, the law in Illinois that a defendant's out-of-court statements must have been voluntarily made in order for the statements to be admissible at trial. (See *People v. Lefler* (1967), 38 Ill. 2d 216, 230 N.E.2d 827; *People v. Wilson* (1985), 138 Ill. App. 3d 513, 485 N.E.2d 1264; *People v. King* (1978), 61 Ill. App. 3d 49, 377 N.E.2d 856.) In the defendant's argument that his confession of July 10, 1987, was not voluntary, the defendant again urges that the events of the four days previous to his interview rendered his statement involuntary. In addition, the defendant claims that his confession was also involuntary as it was induced by a promise of treatment in lieu of prosecution.

■ It is well established that it is the State's burden to show that the defendant's confession was voluntary by a preponderance of the evidence. (*People v. King* (1986), 109 Ill. 2d 514, 488 N.E.2d 949.) On appeal, a circuit court's determination of the voluntariness of a confession will not be overturned unless it is against the manifest weight of the evidence. (*King*, 109 Ill. 2d 514, 488 N.E.2d 949.) To determine whether a defendant's confession is voluntary, a court is required to consider the totality of the circumstances under which the confession was given to determine whether the defendant's will was overborne. *People v. Fuller* (1986), 141 Ill. App. 3d 737, 490 N.E.2d 977.

With regard to the defendant's argument that the events of the previous four days prior to his statement rendered his statement of July 10, 1987, involuntary, an argument previously made in the defendant's argument that he did not voluntarily waive his rights, our reasoning previously set forth on that argument holds true for this argument as well and will not be reiterated here.

■ Similarly, the defendant's additional argument that he was induced into his confession by the promise that he would be given treatment in lieu of prosecution is not persuasive. It was the defendant's testimony which established that he was promised treatment in lieu of prosecution. However, the defendant's testimony was refuted by both Reenan and Officer Thrailkill, for both denied that they told the defendant that he would not be prosecuted or that they promised the defendant that he would receive treatment. Officer Thrailkill testified that the defendant hoped to receive treatment. It has been held that beliefs arising internally from the operations of a defendant's mind are insufficient to show that a defendant's confession was induced by a promise. (*People v. Charboneau* (1977), 46 Ill. App. 3d 686, 361

N.E.2d 125.) So too, are the hopes of a defendant insufficient to support a claim that the defendant's confession was induced through promises of leniency. The totality of the circumstances of the defendant's confession support the circuit court's finding that the defendant's confession was voluntary.

The defendant's second issue on appeal is that the circuit court committed reversible error when it failed to remove a prospective juror for cause. However, this venireman was excluded from the jury by the defendant's use of one of his peremptory challenges. Further, the record reveals that the defendant failed to expend all of the peremptory challenges allotted to him, and he was not forced to accept another juror because he lacked a peremptory challenge to remove him; therefore, it is reasonable to assume that he was not denied a fair and impartial jury because of the court's denial of the defendant's challenge for cause. Since the defendant has demonstrated no prejudice, we do not find that the court's action was error. *People v. Johnson* (1987), 162 Ill. App. 3d 952, 516 N.E.2d 343.

The defendant's third issue is that the court's admission of the evidence of his prior sexual activities with A.B. and C.F. was erroneous, as this evidence of prior bad acts only served to inflame the passions of the jury and prejudiced the jury against him. The law is well established that, in a trial for sexual offenses, evidence of a defendant's prior sexual activities with the same child is an exception to the general rule that a defendant's prior bad acts are not admissible, and such evidence is admissible to show the relationship and familiarity of the parties, to show the defendant's intent, to show the defendant's design or course of conduct, and to corroborate the victim's testimony concerning the offense charged. (*People v. Cregar* (1988), 172 Ill. App. 3d 807, 526 N.E.2d 1376; *People v. Tannahill* (1987), 152 Ill. App. 3d 882, 504 N.E.2d 1283.) Here, the defendant's position was that his conduct on the date of the offense charged was a reasonable medical examination of A.B. and C.F. Given the defendant's position, the testimony of the defendant's prior activities was admissible to show his intent regarding the offenses charged.

It appears, although it is not clear from the defendant's argument, that the defendant contends that the evidence of his prior physical contact with C.F. was inadmissible because he was found not guilty of the charge of aggravated criminal sexual abuse against C.F., and that the admission of this evidence was admission of prior bad acts with a child other than the victim (*i.e.*, A.B.). This argument is untenable as one of the charges for which the defendant was being tried was a charge of aggravated criminal sexual abuse of C.F., and

the evidence presented about C.F. and the defendant's relationship with C.F. was presented for that offense.

■■ In conjunction with the defendant's argument of the admissibility of the evidence of his prior bad acts, he claims that the error of the admission of the evidence was compounded by the failure of the court to instruct the jury, at the time of the admission of the evidence, that the jury was to consider this evidence for the limited purpose of showing his intent. We note that the defendant neither offered a limiting instruction at the time the evidence was offered nor requested the court to *sua sponte* give a limiting instruction in this regard. A defendant is entitled to ask a court to give a limiting instruction on the use of evidence; however, a court is under no duty to give a limiting instruction on its own motion. (*People v. Camp* (1984), 128 Ill. App. 3d 223, 470 N.E.2d 540.) Because the defendant failed to ask the court to give a limiting instruction at the time the evidence was admitted, he has waived this issue.

■■ Further, the court did instruct the jury at the close of the trial that the evidence of the defendant's prior bad acts was to be considered by the jury for the limited purpose of showing the defendant's "intent, motive, design or knowledge." This instruction, which was identical to the instruction recommended in the Illinois Pattern Jury Instructions, Criminal, No. 3.14 (2d ed. 1981) (hereinafter IPI Criminal 2d), was given by the court *sua sponte* over the defendant's objection. The court believed that this instruction was necessary to insure that the jury properly considered this evidence, and it appropriately exercised its supervisory power over the trial and gave the instruction to protect the defendant and to insure the fairness of the trial. (*People v. Chrisos* (1986), 151 Ill. App. 3d 142, 502 N.E.2d 1158.) Because the jury is presumed to follow the law (*People v. Bernard* (1986), 149 Ill. App. 3d 684, 500 N.E.2d 1074), we find that the court properly instructed the jury regarding the evidence of the defendant's prior sexual activities.

■■ The defendant's fourth contention is that he was not proven guilty beyond a reasonable doubt and that, consequently, the court erred in denying his motions for a directed verdict both at the close of the State's case and at the close of all of the evidence. Initially, we note that this issue is, in essence, two issues, *i.e.*, failure to prove the defendant guilty beyond a reasonable doubt and erroneously denying the defendant's motions for directed verdict. While both of these issues were raised in the heading of this issue, the defendant failed to argue or to cite any authority in the body of his brief regarding the issue that his motions for a directed verdict were erroneously denied.

Supreme Court Rule 341(e)(7) requires a party to cite relevant authority and provide more than a bare argument when presenting an issue. (113 Ill. 2d R. 341(e)(7).) When a party fails to argue and to cite authority in support of an issue, that issue is waived. (*People v. Brady* (1974), 23 Ill. App. 3d 330, 318 N.E.2d 642.) The defendant has failed to conform to Supreme Court Rule 341(e)(7) with regard to the issue that the court erroneously denied his motions for a directed verdict, and we decline to consider whether the court erroneously denied these motions.

With regard to the defendant's contention that he was not proven guilty beyond a reasonable doubt, the defendant argues that this is so as there was no medical evidence presented and no evidence of a prompt complaint. We know of no case which states that these are the elements necessary to prove a defendant guilty of aggravated criminal sexual abuse or of aggravated criminal sexual assault, and the defendant provides no authority for this assertion. To sustain a conviction for aggravated criminal sexual assault and for aggravated criminal sexual abuse, if the conviction is based upon the testimony of the child, the child's testimony must be clear and convincing or corroborated. (*Tannahill*, 152 Ill. App. 3d 882, 504 N.E.2d 1283.) In this case, A.B. testified that on the day of the lightning bolt incident, the defendant disrobed her, had her sit on the floor with her legs spread, and inserted his finger into her vagina. We find that A.B.'s testimony of this incident was clear and convincing. Further, although he claimed it was for medical purposes, the defendant's confession corroborated A.B.'s testimony that he inserted his finger into A.B.'s vagina. He also confessed to previous sexual contact with A.B., from which the jury could have readily inferred that the defendant's actions on the day of the lightning bolt incident were not for the purpose of a medical examination, but were sexually motivated. When the evidence in this case is viewed in the light most favorable to the prosecution, it is clear that the defendant was proven guilty beyond a reasonable doubt. *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.

The next issue raised by the defendant concerns the instructions to the jury. In essence, the defendant argues that the provision cited in section 12—18(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 12—18(b)) (that a reasonable medical examination of a minor by a caretaker is not a sexual offense under sections 12—14 and 12—16 of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, pars. 12—14, 12—16)) is an element of the offenses of aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—14) and of aggravated criminal sexual abuse (Ill. Rev. Stat. 1985, ch. 38, par. 12—16),

and as such, should be included in the definitions instructions to the jury. Therefore, the defendant claims that the court erred when it gave the State's instructions and refused his definitions and his burden of proof instructions, wherein he included the provision that it must be shown and proved by the State that his conduct was not a reasonable medical examination. The State contends that the provision for a reasonable medical examination given in section 12—18(b) is an exception or exemption to the offenses of aggravated criminal sexual assault and aggravated criminal sexual abuse and is not an element of the offenses, and therefore, to have included this provision in the definitions instructions would not have been proper. The State further argues that because the provision for a reasonable medical examination by a caretaker was treated here as an affirmative defense and was given in the burden of proof instructions, and was not treated as an exemption to the offenses, the instructions given to the jury imposed a higher burden of proof upon the State in this regard and thus the defendant suffered no prejudice in the treatment of this provision.

■■■ At the outset of our analysis of this issue, we first consider whether the provision of section 12—18(b) is an element of the offenses with which the defendant was charged. Generally, the elements of a crime are found in the definition of the offense as it is stated in the statute. In looking at the statute, neither the statute defining aggravated criminal sexual assault nor the statute defining aggravated criminal sexual abuse includes in its definition the requirement that it be shown that the defendant's actions were not a reasonable medical examination in order to prove that he committed the offense. The failure of this inclusion leads us to conclude that such a provision is not an element of the offenses with which the defendant was charged. Because the provision of section 12—18(b) is not an element of the offenses with which the defendant was charged, the jury was not improperly instructed on the elements of the offenses where this provision was excluded from the definitions instructions.

■■■ Likewise, we cannot conclude that the provision of section 12—18(b) is an affirmative defense. Section 12—17 of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 12—17) specifically sets forth the affirmative defenses which are pertinent to sexual offenses. The affirmative defenses set forth in that section are limited to consent and a reasonable belief that a victim was more than 17 years of age. Clearly, by the omission of the language regarding a reasonable medical examination of a caretaker from section 12—17, and its inclusion in section 12—18, the section entitled "[g]eneral provisions," the

provision of 12—18(b) was not to be considered an affirmative defense. Our determination is bolstered by the language used in *People v. Smith* (1978), 71 Ill. 2d 95, 374 N.E.2d 472, where the supreme court stated:

> "Whenever the legislature intends a provision to constitute an affirmative defense to a crime it has labeled it as such. * * *
>
> Had the legislature intended to treat these exemptions as affirmative defenses, it would have labeled them as such." (*Smith*, 71 Ill. 2d at 106, 374 N.E.2d at 476.)

Having determined that the provision of section 12—18(b) is neither an element of the offenses nor an affirmative defense to the same, we conclude that the State's characterization of the provision contained in section 12—18(b) as an exception or exemption from the sexual offenses is the proper characterization. With this in mind, we now consider whether the jury was properly instructed with regard to the provision of section 12—18(b), which formed the substance of the defendant's case.

When considering the issues of specific instructions, a reviewing court must examine the instructions as a whole to determine whether the jury was adequately and properly instructed on the applicable law. (*People v. Friedman* (1986), 144 Ill. App. 3d 895, 494 N.E.2d 760.) It is the court who must bear the burden of seeing that the jury is properly instructed, and a jury must be instructed, at a minimum, as to the elements of the crime charged, the presumption of innocence, and on the burden of proof. (*Friedman*, 144 Ill. App. 3d 895, 494 N.E.2d 760.) If the instructions, viewed as a whole, fully and properly inform the jury of the law applicable to the case, then the jury has been properly instructed. *People v. Goff* (1985), 137 Ill. App. 3d 108, 484 N.E.2d 414.

In the case *sub judice*, the jury was instructed by the court on the definition and the burden of proof of each of the offenses with which the defendant was charged. The definition instructions tendered by the State and given to the jury were in conformance with the IPI instructions for the offenses of aggravated criminal sexual assault and aggravated criminal sexual abuse. (See IPI Criminal 2d Nos. 11.33, 11.38 (Supp. 1989).) It was also the State's instructions on the burden of proof which were given to the jury. These instructions were modified IPI instructions for the offenses of which the defendant was charged (IPI Criminal 2d Nos. 11.34, 11.40 (Supp. 1989)), with the only modification being the addition of a statement that the State must prove beyond a reasonable doubt that the defendant's actions were not a reasonable medical examination by a caretaker. This in-

struction placed an unnecessary burden of proof on the State, a burden of proof higher than is required for an exemption or exception to an offense, for generally, it is the defendant's burden to prove he is entitled to the exemption by a preponderance of the evidence (*People v. Delk* (1981), 96 Ill. App. 3d 891, 421 N.E.2d 1341), and the State need not negate an exemption (*Smith*, 71 Ill. 2d 95, 374 N.E.2d 472). Therefore, although the jury was not properly instructed on this issue, the defendant nevertheless was not prejudiced by the instructions as given, since the instructions directed the jury to find that the State must meet this higher standard. Likewise, by so instructing the jury, the defendant's theory of the case was put before the jury, and by the jury finding the defendant guilty of the charges of aggravated criminal sexual assault and aggravated criminal sexual abuse, it is clear that the jury rejected the defendant's theory. Therefore, when the jury instructions are viewed as a whole, we cannot conclude that the jury instructions as given constituted reversible error.

The last issue raised by the defendant is that the restitution ordered by the court in its sentencing order was improper and an abuse of discretion. The defendant argues that the rules governing ordinary restitution apply here, and under those rules, the court's order for restitution was improper for the following reasons: (1) that the restitution ordered was imposed to compensate for a loss not yet incurred by the victim, *i.e.*, the restitution was for future losses and not actual losses; (2) that the court did not fix the amount of the restitution with sufficient clarity to preclude the need for further judicial action; and (3) that the court imposed the restitution without first determining whether the defendant had the ability to pay the ordered sums. The State argues that the imposition of restitution by the court was proper either under section 12—18(d) of the Criminal Code of 1961 (Ill. Rev. Stat., 1988 Supp., ch. 38, par. 12—18(d)) or under the rules governing restitution.

At the sentencing hearing held on July 19, 1988, the circuit court sentenced the defendant to concurrent terms of 12 years' incarceration for his conviction of aggravated criminal sexual assault and seven years' incarceration for his conviction of aggravated criminal sexual abuse. In addition to his incarceration, the court ordered that the defendant undergo medical testing for sexually communicable diseases, and it also ordered that the defendant make restitution to the victim in the amount of $2,500. In so doing, the court stated as follows:

> "The law permits me to order a Defendant to make restitution to a victim of his offense, and I'm going to order that $2,500,

which I consider a token amount, be taken from the bond money which secured the Defendant's freedom while he was awaiting trial in this case and is being held by the clerk of the court, that $2,500 of that bond money be held by the clerk as and for restitution for the psychological damage that was proximately caused by the conduct of the defendant. At least, as I say, in minor part, I think it's clear from the pre-sentence report that the victim is having some kind of emotional or psychological problems, as one would expect, and I'm going to order that money be held in trust for her to help pay for any psychological or psychiatric or mental health counselling or treatment she may need or as may be desirable. The intent of this order would be that this money would be at the earliest possible time placed in a court approved interest bearing account, to be held in trust for her and not expended except with prior approval of the court."

Subsequently, in the court's written judgment and sentence, filed in this case on August 18, 1988, the court again indicated that the defendant was to pay restitution in the amount of $2,500. The court reiterated that this amount was to be paid to the victim "as partial compensation for psychological or emotional harm proximately caused by the conduct of the defendant." The court ordered that the monies were to be drawn from the defendant's bail deposit and were to be held by the clerk of the court in an interest-bearing account in trust for A.B. The money was to be expended only with prior approval of the court for the benefit of A.B., and upon A.B. attaining her majority, the remaining monies not expended were to be distributed to A.B.

■ The defendant has contended that under the rules governing ordinary orders of restitution, the court's order cannot stand. In this statement the defendant is correct, as the restitution statute, at the time of the court's sentencing order, made no provision for payments for a victim's psychiatric or psychological treatment. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—6.) (We note, however, that on August 19, 1988, one day after the court's written judgment and sentence were filed, the restitution statute was amended to allow a court to order a defendant convicted of a sexual offense to pay for a victim's counselling. (Ill. Rev. Stat., 1988 Supp., ch. 38, par. 1005—5—6(g)(1)).) However, while the court's order was not proper under the restitution statute, we find that the court's order was an authorized disposition under section 12—18(d). Section 12—18(d) provides as follows:

"In addition to the sentences provided for in Sections 12—13, 12—14, 12—15 and 12—16 of the Criminal Code of 1961 the

Court may order any person who is convicted of violating any of those Sections to meet all or any portion of the financial obligations of treatment, including but not limited to medical, psychiatric, rehabilitative or psychological treatment, prescribed for the victim or victims of the offense." (Ill. Rev. Stat., 1988 Supp., ch. 38, par. 12—18(d).)

Clearly, from this section, the legislature intended that a defendant who has committed a sexual offense should bear some of the expense for the psychological or physical harm which he had incurred. Since the court's actions were authorized under the foregoing statutory provision, we find that the court's order of restitution was properly entered.

However, we are troubled by the ultimate disposition of the remaining funds in the trust established by the court. The court's order required that, upon A.B. reaching her majority, the remainder of the funds be distributed to her at that time. We do not find that the court had the authority to do this. Section 12—18(d) states that the payments ordered by the court are to be expended for treatment prescribed for a victim, *i.e.*, it is not to be a direct payment to the victim, but it is to defray the cost of expenditures made to a service provider. Here, the court is giving A.B. the money regardless of whether the money is spent for treatment, and we find that this distribution of the funds overreaches the purpose of section 12—18(d). Therefore, under our discretionary powers of Supreme Court Rule 366(a) (107 Ill. 2d R. 366(a)), we modify that portion of the court's sentencing order wherein the funds remaining, if any, in the trust established for the purpose of paying for the psychiatric and psychological treatments of A.B. be returned to the defendant upon A.B.'s reaching her majority.

For the foregoing reasons, the judgment of the circuit court of Williamson County is affirmed as modified.

Affirmed as modified.

CHAPMAN and RARICK, JJ., concur.