2025 IL App (1st) 232441-U

Fourth Division
Filed September 30, 2025

No. 1-23-2441

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LAWRENCE JACKSON, Defendant-Appellant. | Appeal from the Circuit Court of Cook County No. 20 CR 0627001 The Honorable Mary Margaret Brosnahan, Judge, presiding. |

JUSTICE OCASIO delivered the judgment of the court.
Presiding Justice Navarro and Justice Lyle concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The circuit court did not abuse its discretion when it admitted body worn camera footage as it was not substantially more prejudicial than probative. Accordingly, the circuit court did not commit plain error, and defense counsel did not provide ineffective assistance of counsel.

¶ 2    Following a jury trial, Lawrence Jackson was convicted of first-degree murder and sentenced to 50 years' imprisonment. On appeal, Jackson contests the admission of body-worn camera footage showing the victim's body, arguing that it was prejudicial and incited the jury's emotions. Jackson also claims that trial counsel was ineffective for not adequately preserving this issue for appeal. For the stated reasons, the conviction is affirmed.

¶ 3                                    I. BACKGROUND

¶ 4        Jackson was indicted for first degree murder. Before the trial, the State filed a *motion in limine* seeking to admit the body-worn camera footage of Officer Huberts[1] arrival to the house. The State argued that the video and the statements were admissible under either the excited utterance hearsay exception or as statements of identification. Defense counsel objected and argued that the statements were being "offered for the truth of the matter asserted being that people were frantic and they're stating the name of Lawrence Jackson." Furthermore, Jackson contended that the "[w]itnesses are going to testify that they saw Lawrence Jackson leave the residence. So this is just—would be a prior consistent statement and it has no real probative value because they're getting this evidence." Defense counsel further claimed the video "is so compelling on the issue of arousing passion with the jury because that's really the only true purpose of playing [it]" and "it has so much power, so much prejudice to see the pain and the agony that the people are going through at the time *** So that doesn't have any probative value. It's highly prejudicial." The State offered to publish it without sound if the court ruled the statements were inadmissible.

¶ 5        The court granted the State's motion despite defendant's objection. The circuit court ruled that "that mom's statements of he killed my baby I'm not allowing into evidence She wasn't there. She didn't see it occur." The court further ruled that "other than those two statements by the mom where she says, He killed her," the reminder of the video would not be a violation of hearsay. The video explained the officer's course of conduct and "[t]he rest would come in either as excited utterance or as non-hearsay which is just to explain the course of conduct, who they were looking for, where they went, why they looked there."

¶ 6        At trial, Evita Coleman, the victim's mother, testified that on November 19, 2019, she lived at 10229 South Morgan Street with her husband, Willie Bradley, and her children, Keishianta, Sare, Devon, Devin, and Deon. At the time, Keishianta was 22 years old, Sare was "16 or 17," twins Devon and Devin were 11, and Deon was "6 or 7." Evita testified she had known Jackson since he

---

[1] Officer Huberts's first name was not given at trial and does not appear in the record.

was a child. In 2018, Jackson was allowed to live with the Colemans in their basement. At some point, Jackson was permitted to sleep in Keishianta's bedroom. In early 2019, Jackson was no longer allowed to stay in the home. Evita did not know that Jackson sometimes sneaked into the home. Evita additionally testified that she possessed a firearm, which she secured in a safe located in her bedroom closet. She stated that other individuals were prohibited from bringing firearms into the residence.

¶ 7    On November 19, 2019, Keishianta took her dinner upstairs to her room. At the time, Evita did not know that Jackson was upstairs with Keishianta. Around 10:00 p.m., Evita was watching television downstairs when she "heard this loud bump." Evita got up to see if anyone else had heard the noise. Evita testified that the boys said they didn't hear anything, and she called upstairs for Keishianta and Sare to respond but they did not answer. When Evita returned to her bedroom, Willie stated that he also heard the noise. Willie then went to the stairs and asked Sare again if she had heard anything. Sare stated she did not hear anything and came downstairs. Evita heard the front door chime, and when she asked who left out the door, Deon "said it was Lawrence, momma." Sare went upstairs to Keishianta's room, and her scream triggered Evita and the rest of the family to hurry upstairs where they discovered Keishianta's body. Sare called the police. Incidentally, Keishianta's body was not moved by the family. Detectives informed Evita that Keishianta had been fatally shot in the chest.

¶ 8    Sare Coleman testified she would help Keishianta sneak Jackson into the house by distracting Evita. On November 19, 2019, Sare left late for school and saw Jackson entering the home as she left. Keishianta was the only person in the house at the time. When Sare returned home from school she did not know if Jackson was still in the house as Keishianta's door was closed. That evening Sare was in her bedroom, which was across from Keishianta's, listening to music with headphones. Sare testified that she heard yelling from downstairs and her parents were asking if she had heard a noise. As Sare was going downstairs, she saw that Keishianta's bedroom door was "slightly cracked." Sare "saw Lawrence. He was like lying putting on his coat and stuff like getting ready." Jackson "had a frantic look in his eyes like he was worried."

¶ 9        Sare went downstairs to her parents' bedroom and stood in the doorway. While talking to her parents, Sare noticed Lawrence leaving out the front door and said "[h]e was moving quick." When Evita asked about the door chime, Sare answered said she "didn't know" and Deon said it was Lawrence. Evita then began calling Keishianta, and when she did not answer, Evita sent Sare upstairs to go get her.

¶ 10        When Sare went upstairs she saw Keishianta lying on her bed with her covers down and seeing there was "blood everywhere and she just wasn't moving." Sare testified that she panicked and screamed. She called 911, and the police got there "pretty fast." Sare testified that the State's exhibit 4, a body-worn camera video clip (not the one at issue on appeal), truly and accurately captured her conversation with an officer minutes after she called 911. Defense counsel did not object, and the video was admitted and published for the jury. After the video was played, Sare further testified she saw Jackson standing next to the bed and she did not see him check on Keishianta.

¶ 11        Sare went to the police station, where she gave a statement and identified Jackson in a photo array. While she was at the police station, Sare texted Jackson "you a bitch," and Jackson responded that "[he] ain't do it." This text exchange was Sare's last communication with Jackson.

¶ 12        Devin Bradley testified that around 10:00 p.m. on November 19, 2019, he was at the kitchen table doing his homework when he heard a soft thump coming from upstairs. After hearing the thump, he saw Lawrence Jackson running down the stairs and out the front door wearing a red puffy jacket. The door chimed, and Willie asked "who was that" and Devin answered that "it was Lawrence." Devin identified Jackson in court.

¶ 13        Willie Bradley testified that at around 10:00 p.m. on November 19, 2019, he heard "a loud boom, bang" coming from upstairs while he was in the kitchen helping Devin with his homework. Willie yelled up upstairs asking what the noise was. Sare came downstairs and said that "she didn't hear anything." Evita called upstairs to Keishianta and she did not answer. Willie heard the door chime. He "asked who was going out the door" and "Deon said Lawrence just went out the door." Evita sent Sare upstairs to check on her sister, and a short time later "[Sare] was yelling and

screaming." The rest of the family hurried upstairs. Willie saw Keishianta lying across her bed, no one else was in the bedroom. Willie testified he got in his car and drove around "trying to find this guy." He was unable to find Jackson.

¶ 14    On November 25, 2019, while going through Keishianta's closet, Willie found a gun box inside a shoe box. There were "[s]ome bullets and the materials you need to clean the gun" inside of the box. Willie brought the box to Evita, who called the police. Willie placed the gun box inside the front closet until it could be collected by the police. Willie did not remove anything from the box or move it from the front closet.

¶ 15    Chicago Police Department Detective Paul Habiak testified on November 19, 2019, he, an evidence technician, was dispatched to the home to process the crime scene. Habiak photographed the scene, and later his photographs were admitted into evidence. These photographs put on view different angles of Keishianta's body, coupled with other evidence including a wine bottle and a Remy Martin liquor bottle. There were also photographs depicting "a silver and black magazine containing an unknown number of rounds marked inside a show box." Habiak also identified physical evidence collected at the scene. One of those items was a wallet, which contained Jackson's state identification card, firearm owner identification card, and social security card.

¶ 16    Before Officer Huberts testified, the State informed the court that his body-worn camera video "[would] be played silent, muted" to comply with the Court's ruling. Officer Huberts testified that on November 19, 2019, he was working on routine patrol when at approximately 10:00 p.m. he received a call for a person who was shot at 10229 South Morgan. Huberts responded to the call and was wearing a body-worn camera, which he activated prior to entering the home. Huberts testified the first concern when responding to a call of a person shot is to, if possible, preserve that person's life. Additionally, he is concerned with "is their offender still on-scene, where is the person with the gun." Huberts body camera video was published, without sound, and defense counsel did not raise any objection.

¶ 17    The video showed Officer Hubert and his partner entering the home and going to Keishianta's bedroom. It depicted Keishianta lying on the bed and emergency medical personnel entering the

room. The video did not show the face of Evita; however, Sare's face was visible when she was talking to the officers and the face of one the Keishianta's younger brothers was also briefly shown.

¶ 18   Huberts further testified that there was no gun, casing, or shell casing at the crime scene. Huberts testified that "[t]here was a person described and a place he might have been," but the suspect was not present in the home. Huberts testified that the scene was "[e]motional. People were in disbelief. Emotional."

¶ 19   Dr. Marta Helenowski, a forensic pathologist and assistant medical examiner at the Office of the Cook County Medical Examiner, testified that on November 20, 2019, she performed an autopsy on Keishianta Coleman. Toxicology testing revealed a blood alcohol concentration of 0.135. Dr. Helenowski testified that "[u]pon external examination there was trauma" in the form of "a gunshot wound to the right side of [Keishianta's] chest." The bullet trajectory was "front-to-back and slightly right-to left." Dr. Helenowski testified that, based on the lesions around the entrance of the wound, the muzzle of the gun "was located in the intermediate range or close range of contact," which would have between half an inch to three feet away from the skin. Photographs depicting the wound entrance were admitted into evidence without objection. Dr. Helenowski opined that the cause of death was a gunshot wound to the chest and the manner of death was homicide.

¶ 20   The parties stipulated that Jackson purchased a Springfield Armory XD Defender 9-millimeter pistol on January 27, 2019, from the Eagle Sports Range in Oak Forest, Illinois, and that Jackson took possession of the gun three days later. The parties also stipulated that an employee of the firearm manufacturer would identify the pistol and testify that the serial number matched that of the pistol purchased by Jackson.

¶ 21    Illinois State Police forensic scientist Kathyrn Doolin testified she examined a 9-millimeter fired bullet recovered from the crime and opined that it could have been fired from Jackson's gun.

¶ 22   The parties stipulated that cell tower data from Jackson's cell phone placed him in the vicinity of Keishianta's house on the night of the shooting. The cell phone made a voice call at 5:16 p.m.

and outgoing calls at 7:41, 10:09, 10:15, and 10:16 p.m. from the vicinity of 10229 South Morgan Street.

¶ 23    Chicago Police Detective James Smith testified that on November 19, 2019, he was on duty when he received a call that a homicide had occurred. When Smith arrived on scene, beat officers and evidence technicians were already present. Smith received Jackson's phone number from Sare. Smith received records of Jackson's cell phone activity pursuant to a search warrant.

¶ 24    Jackson was taken into custody on June 15, 2020. Smith conducted two video-recorded interviews of Jackson on June 15 and June 16, 2020. Both interviews were admitted into evidence and published for the jury without objection. During his first interview, Jacked stated that he did not know what happened to Keishianta. Jackson also stated that he lost his phone and that his gun had been stolen in the summer of 2019. Smith did not find any report indicating that Jackson's gun had been stolen.

¶ 25    Jackson testified that on November 19, 2019, his gun was being stored "in a closet" in "[m]y girl's bedroom." Jackson confirmed that Keishianta knew that the gun was being stored in her closet. Jackson admitted that he lied to Detective Smith when he told him he was not at Keishianta's house. Jackson testified he went to the house that morning "[t]o chill with my lady," and they "ate, had sex, drank." Jackson testified he drank about half a bottle of Remy Martin and Keishianta drank "a lot" of wine.

¶ 26    Jackson had a phone call with the mother of his children and he said "I love you." Keishianta was next to Jackson when he made the call, and she knew he had twins by another woman. At some point after the call, Jackson went to the bathroom and when he came back to the bedroom, Keishianta "was mad and hysterical and had the gun" pointing it at him. Jackson told her to calm down. He "s[aw] her trying to put her finger, basically, where the trigger is and I rushed her because she's trying to shoot me like trying to kill me." Jackson "rushed her and grabbed the gun and we tussled and it went off." Jackson testified that "it was an accident." Jackson admitted that he took the gun when he left the house and that he did not report the shooting to the police nor or attempt to render aid to Keishianta.

¶ 27    On cross-examination, Jackson testified he threw the gun in a sewer. Additionally, Jackson "smashed" his phone and threw it in the garbage after he received the text message from Sare. Jackson also confirmed he drank half a bottle of cognac prior to Keishianta returning home from work. Jackson confirmed he lied to the police when he told them he was not at the home on November 19 and that he did not tell the police that it was an accident. Jackson reaffirmed that Keishianta was holding the gun when he returned from the bathroom. They "tussled for the gun and it just—when [he] pulled it from her it went off." The gun went off when it was in Jackson's hands. Jackson again confirmed he did not render aid to Keishianta and he did not call 911. Jackson testified that Keishianta "died in my arms."

¶ 28    The jury found Jackson guilty of first-degree murder. Jackson was sentenced to 50 years' imprisonment, concurrent with a 25-year enhancement for personal discharge of a firearm. Jackson filed a motion to reconsider sentence, which was denied on December 9, 2023. This appeal timely follows.

¶ 29                              II. ANALYSIS

¶ 30    On appeal, Jackson argues he was denied a fair trial because the jury was allowed to view video which "was admitted for no other purpose than to garner sympathy from the jury for the victim's family and arouse the jury's hostility toward Lawrence." Although Jackson objected to the video's admission at the hearing on the motion *in limine*, he did not preserve that objection in his posttrial motion, thereby forfeiting it for appeal. See *People v. Denson*, 2014 IL 116231, ¶ 18. Jackson seeks review under the plain error doctrine or, alternatively, on the grounds of ineffective assistance of counsel.

¶ 31                         A. Plain Error Doctrine

¶ 32    The plain error doctrine is a narrow exception to the forfeiture general rule. *People v. Jackson*, 2022 IL 127256, ¶ 18. Illinois Supreme Court Rule 615(a) states, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a). In order for the plain error doctrine to apply, a defendant must show that a

clear and obvious error occurred and either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Therefore, the first step is to determine whether there was a clear and obvious error. *People v. Sebby*, 2017 IL 119445, ¶ 49.

¶ 33     All relevant evidence is admissible, except as otherwise provided by law. Ill. R. Evid. 402 (eff. Jan. 1, 2011). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). When weighing the admissibility of evidence, the trial court must weigh the prejudicial effect against the probative value, and "[c]ompetent evidence should not be excluded merely because it may arouse feelings of horror or indignation." *People v. Degorski*, 2013 IL App (1st) 100580, ¶ 100. Admission of evidence is within the discretion of the trial court, and its ruling will not be reversed absent an abuse of discretion. *People v. Becker*, 239 Ill. 2d 215, 234 (2010).

¶ 34     Jackson contends that the circuit court erred in admitting Officer Huberts's body-worn camera video, asserting that this entitles him to a new trial. Jackson argues that the video was emotionally overwrought and unduly prejudicial. Though the video was presented without sound to the jury, Jackson claims that the "sheer emotion" displayed aimed to influence the jury towards a guilty verdict. Furthermore, Jackson asserts that any relevant evidence shown in the video, particularly the position of Keishianta's body and other evidence in the bedroom, was already conveyed to the jury through other exhibits and testimony. He argues that the video's sole purpose was "to inflame the passion of the jurors and prejudice them against Lawrence."

¶ 35     We are unable to say that the circuit court abused its discretion. The video certainly met the minimum requirement of relevance. First, the video showed that Officer Huberts was acting in the course of his official duties when he was dispatched to the residence. See *People v. Williams*, 181 Ill. 2d 297, 313 (1998) (finding evidence showing that a police officer was working in his official

capacity was properly admitted). Second, by depicting the positioning of Keishianta's body and the layout of the bedroom, the video helped the jury evaluate Jackson's claim of self-defense. See *People v. Colone*, 2024 IL App (1st) 230520, ¶ 132; *Williams*, 181 Ill. 2d at 313. Jackson testified that he and Keishianta struggled over the gun, and after it discharged, Keishianta died in his arms. The video showed how the body was discovered and the distance between the bed and the closet. It also showed the positioning of Devin at the dining room table in relation to the front door. The fact some of this information may have been conveyed through oral testimony does not render the recording inadmissible. See *People v. Jurczak*, 147 Ill. App. 3d 206, 213 (1986). Moreover, because first responders moved Keishianta's body during lifesaving efforts, the photographs of the crime scene did not depict the positioning of her body before their arrival; the video, by contrast, did, so it was not cumulative. See *People v. Ortiz*, 235 Ill. 2d 319, 335 (2009) ("Evidence is considered cumulative when it adds nothing to what was already before the jury."). It allowed the jury to evaluate Jackson's testimony about the events during and after the shooting against visual evidence. The prejudicial impact of the video was minimized by the State's decision to play it without any audio, and the circuit court was well within the bounds of reason when it determined that the probative value of the video was not substantially outweighed by whatever lingering prejudice remained. Admitting the video was not an abuse of discretion. Therefore, we find no plain error. *People v. Hood*, 2016 IL 118581, ¶ 18 ("In applying the plain error doctrine, it is appropriate to determine first whether error occurred at all because 'without error, there can be no plain error.' ") (quoting *People v. Smith*, 372 Ill. App. 3d 179, 181 (2007)).

¶ 36                                   B. Ineffective Assistance of Counsel

¶ 37        Alternatively, Jackson argues his trial counsel provided ineffective assistance for failing to preserve this issue for appeal. The United States Constitution and Illinois Constitution guarantee criminal defendants the right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. 1, § 8. To establish a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness, and (2) a

reasonable probability exists that but for counsel's deficient performance, the result would have been different. *Stickland v. Washington*, 466 U.S. 668, 687 (1984).

¶ 38 Jackson contends that there was a reasonable probability of a different outcome if counsel had properly preserved the issue of the video admission in a post-trial motion. However, as previously stated, the circuit court did not err in admitting the video, which means Jackson was not prejudiced by counsel's omission of the issue from the posttrial motion. *People v. Coleman*, 158 Ill. 2d 319, 349 (1994). Accordingly, counsel was not ineffective.

¶ 39                              III.  CONCLUSION

¶ 40 Based on the foregoing reasons, we affirm the circuit court's judgment.

¶ 41 Affirmed.